Odealia TURNER and Bruce Turner, individually and as custodial parents and next friends for Jason Turner and Kathleen Turner, Plaintiffs,

v.

SHERIFF OF MARION COUNTY; G. Tomey, Unit 32, M.C.S.D.; K. Buckner, Unit 475, M.C.S.D.; B. McAtee, Unit 400, M.C.S.D., Defendants.

No. IP97–2013–C–F/D.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 1, 2000.

John M Schwartz, Attorney at Law, Indianapolis, IN, for plaintiffs.

A Scott Chinn, Corp Counsel For the City of Indpls, Caren L Pollack, Huffer & Weathers Pc, Thomas Satrom, Office of Corporation Counsel, James S Stephenson, Stephenson Daly Morow & Kurnik, Indianapolis, IN, for defendants.

## CERTIFICATION OF QUESTIONS

### to the Supreme Court of the State of Indiana.

FOSTER, United States Magistrate Judge.

Pursuant to Rule 15(O) of the Rules of Appellate Procedure of the State of Indiana, we respectfully request the Supreme Court of the State of Indiana to accept these certified questions concerning issues of state law. While we should not be hesitant to employ this useful opportunity to clarify state law afforded by the Supreme Court, *Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388, 1402 n. 2 (7th Cir.1992) (Ripple, J., concurring in part and dissenting in part), we recognize the prudence of certifying only those questions that might control the outcome of a case, *see Shirley v. Russell,* 69 F.3d 839, 844 (7th Cir.1995) (interpreting 7th Cir. R. 52), and we are sensitive to the principle of judicial restraint in addressing constitutional issues, especially novel constitutional issues in a non-specific factual context, *Citizens National Bank of Evansville v. Foster,* 668 N.E.2d 1236, 1241–42 (Ind.1996). To these ends, we have been careful to assure that the answers to the questions we present are likely to be determinative of claims, defenses, or remedies in this Cause and we have endeavored to give as complete a factual background as the current status of this Cause allows. As usual, we encourage the Supreme Court to reformulate the questions if they conclude that the wrong ones have been asked, *see, Todd v. Societe BIC, S.A.,* 9 F.3d 1216, 1222 (7th Cir.1993), and to illuminate any errors or omissions in our discussion of Indiana law.

Pursuant to 28 U.S.C. § 636(c)(1) and Fed.R.Civ.P. 73(a), and upon the consents

of the parties, defendants' Consents (January 22 and February 23, 1998, doc. nos. 13 and 14); plaintiffs' Consent (February 23, 1998, doc. no. 14), the special designation of the Court, S.D.Ind.LR 72.1(h), and the reference of the assigned district judge, Order of Reference (March 4, 1998, doc. no. 16), this Cause is before the undersigned magistrate judge to conduct any and all proceedings and to order the entry of judgment.

## I. Factual background.

The following facts were taken from the parties' statements of material facts submitted on the defendants' motion for summary judgment. Unless otherwise noted, these facts were undisputed.

On February 24, 1997, defendant Kerry Buckner, a detective employed by the Sheriff of Marion County, Indiana in his Narcotics Unit, obtained a warrant from a Marion County Superior Court judge to search the residence at 5201 West Chelsea Road in Indianapolis. Detective Buckner's supporting probable cause affidavit was based on the relations of another deputy sheriff who had observed and seized evidence of suspected controlled substances violations while inside 5201 West Chelsea Road on February 15, 1997, nine days earlier.[1] The warrant was executed later

---

1. The affidavit was not made a part of the record by either side. A copy was supplied to the Court in chambers and we set out its contents for background:

AFFIDAVIT
FOR PROBABLE CAUSE
STATE OF INDIANA, COUNT OF MARION,
SS:
DET. KERRY BUCKNER
SWEARS (AFFIRMS) THAT
ON 15 FEBRUARY 1997 OFFICER SMITH OF THE MARION COUNTY SHERIFFS DEPARTMENT ATTEMPTED TO SERVED AN ARREST WARRANT ON A SUBJECT AT THE RESIDENCE OF 5201 W CHELSEA RD, MARION COUNTY INDIANA.
WHILE IN THE RESIDENCE AT 5201 W CHELSEA RD SEARCHING FOR JACK WHITEMAN, OFFICER SMITH WITH THE PERMISSION OF THE HOME OWNER SANDY CONS WAS IN THE BASEMENT AREA OF THE RESIDENCE. OFFICER SMITH SAW IN PLAIN VIEW A WOODEN PIPE LAYING ON TOP OF A WASHING MACHINE, OFFICER SMITH IMMEDIATELY RECOGNIZED THIS TO BE A PIPE WHICH IS USED TO CONSUME MARIJUANA. OFFICER SMITH ALSO FOUND A MARIJUANA SMOKING DEVICE KNOWN AS A ONE HITTER, A SET OF HAMPTON SCALES AND SEVERAL PLASTIC BAGGIES. OFFICER SMITH KNEW THROUGH HIS EXPERIENCE AS A LAW ENFORCEMENT OFFICER THAT THESE PARTICULAR SCALES WERE COMMONLY USED TO WEIGH ILLEGAL NARCOTICS, AND THAT PLASTIC BAGGIES ARE COMMONLY USED TO PACKAGE AND SELL ILLEGAL NARCOTICS.
OFFICER SMITH SEIZED THE PIPE, SCALES AND BAGGIES AND PLACED THEM IN THE INDIANAPOLIS POLICE DEPARTMENT PROPERTY ROOM AS EVIDENCE. ON 21 FEBRUARY 1997 THIS AFFIANT TOOK THE ITEMS SEIZED BY OFFCIER SMITH AND PLACED THEM IN THE INDIANAPOLIS POLICE DEPARTMENTS NARCOTICS DROP SAFE FOR ANALYSIS. ON 24 FEBRUARY 1997 THIS AFFIANT WAS NOTIFIED BY IMCSFA THAT TECNICIAN BENSLEY HAD TESTED THE ITEMS SUBMITTED AND THAT THE PRESENCE OF MARIJUANA RESIDUE WAS FOUND ON THE PIPE.
OFFICER SMITH IN HIS OFFICIAL POLICE REPORT STATED THAT WHEN HE ENTERED THE BASEMENT HE NOTED THAT THE BASEMENT WAS VERY DIRTY. WHEN HE BEGAN LOOKING AROUND HE FOUND A STORAGE AREA INSIDE THE BASEMENT. THE STORAGE AREA DREW HIS ATTENTION BECAUSE IT WAS THE ONLY THING IN THE BASEMENT THAT WAS FRESHLY PAINTED. UPON CLOSER INSPECTION OFFICER SMITH NOTED THAT THERE WERE TWO DEADBOLT LOCKS ON THE DOOR TO THIS STORAGE ROOM WHICH WAS SIX FOOT TALL AND TEN FOOT DEEP. UPON ASKING SANDY CONS FOR A KEY FOR THIS STORAGE AREA, SHE STATED THAT IT WAS HER HUSBAND SCOTT CONS ROOM AND HE HAS THE ONLY KEY AND WAS OUT OF TOWN AT THE TIME OF THIS SEARCH. THROUGH THIS OFFICERS EXPERIENCE IN INVESTIGATING NARCOTICS ACTIVITY, THE FACTS GIVEN BY OFFICER SMITH LEADS THIS OFFICER TO BELIEVE THERE ARE ILLEGAL NARCOTICS, RECORDS AND MONIES RELATED TO ILLEGAL NARCOTICS SALES ON THE PREMISES LOCATED AT 5201 W CHELSEA RD. BASED ON THE ABOVE INFORMATION AND FACTS THIS AFFIANT REQUESTS A SEARCH WARRANT BE ISSUED TO DILIGENTLY SEARCH THE ABOVE RESI-

that evening. The warrant described the house as a two-story single family dwelling with a white wood covering, address numbers on the porch pillar at the north section of the residence, and a dirt-covered driveway running to the east of the residence.[2] The only defendant who had seen 5201 West Chelsea Road before the warrant was executed was Detective Buckner. He was new to the Narcotics Unit and was still in training with a Field Training Officer ("F.T.O.") on the day of the search. This was also his first search. On that day, Detective Buckner's regular F.T.O. was on vacation and a new one was assigned to him. During daylight hours on that day, Detective Buckner went to 5201 West Chelsea Road with his substitute F.T.O. to obtain a physical description of the residence for the warrant.

Defendant McAtee, at this time a Sergeant in the Marion County Sheriff's Narcotics Unit, was Mr. Buckner's supervisor. She assigned his substitute F.T.O. and sent both of them to obtain the physical description and to obtain the warrant from the judge. The F.T.O. is not a defendant in this action but she did participate in the execution of the warrant.

The plaintiffs' residence is located at 5129 West Chelsea Road (again, the warrant residence was 5201 West Chelsea Road). Numbers indicating the plaintiffs' address were clearly marked on the mail box and were marked on the gable above the front porch.[3] Both the warrant residence and the plaintiffs' residence have porches on the north ends of the houses, dirt-covered or gravel-covered driveways on their east sides, detached garages at the end of the driveways, white siding, and yellow brick half-walls on the porches. Unlike the warrant residence, the plaintiffs' residence is a single-story house; it

---

DENCE TO INCLUDE OUT BUILDINGS AND VEHICLES LOCATED ON THE PROPERTY FOR MARIJUANA, OTHER CONTROLLED SUBSTANCES OR ILLEGAL NARCOTICS, MONIES OR RECORDS RELATED TO THE SALE OR DISTRIBUTION OF ILLEGAL NARCOTICS, WEAPONS USED TO PROTECT SAID INTEREST, PERSONS ON OR ABOUT THE PROPERTY THAT COULD BE CONCEALING ILLEGAL NARCOTICS OR WEAPONS.
THE RESIDENCE LOCATED AT 5201 W CHELSEA RD IS DESCRIBED AS, A TWO STORY SINGLE FAMILY DWELLING. THE OUTER STRUCTURE OF THE RESIDENCE IS OF WOOD COVERING AND IS WHITE IN COLOR, THERE IS A FRONT PORCH WITH THE NUMBERS 5201 ON THE PORCH PILLAR. THE FRONT DOOR IS CENTERED ON THE RESIDENCE AT THE FRONT.
I SWEAR (AFFIRM), UNDER PENALTY OF PERJURY AS SPECIFIED BY IC 35–44–2–1, THAT THE FOREGOING REPRESENTATIONS ARE TRUE.
DATED: [written] Feb. 24, 1997
DEPUTY PROSECUTING ATTORNEY
NINETEENTH JUDICIAL CIRCUIT
[signed] Kerry Buckner
AFFIANT
[signed] John Downer
JUDGE

2. The warrant reads, in relevant part, as follows:

You are therefore AUTHORIZED and ORDERED, in the name of the State of Indiana, with the necessary and proper assistance, to enter into (upon) the following described residence (premises) (motor vehicle) (person) to wit; A TWO STORY SINGLE FAMILY DWELLING, WITH A WHITE WOOD IN APPEARANCE COVERING, WITH THE NUMBERS 5201 ON ATTACHED TO A PORCH PILLAR AT THE NORTH SECTION OF THE RESIDENCE. THE DRIVEWAY RUNS TO THE EAST OF THE RESIDENCE AND IS DIRT COVERED, LOCATED AT 5201 W CHELSEA RD. ANY VEHICLES ON SAID RESIDENCE OR ON OR ABOUT CURTILAGE OF SAID RESIDENCE, AND ANY PERSON(S) FOUND TO BE ON SAID PROPERTY, AND ANY OUT BUILDINGS ON SAID PROPERTY.
and there diligently search for the following described property (person), to wit: MONIES, RECORD KEEPING, WEAPONS, AND ILLEGAL CONTROLLED SUBSTANCES
You are further ORDERED to seize such property, or any part thereof found on such search.
Search Warrant, Buckner Affidavit, Exhibit A. The warrant issued at 4:25 p.m. on February 24, 1997. *Id.*

3. The defendants disputed only whether the numbers indicating the plaintiffs' address were "clearly marked" on the porch gable.

has two brick porch pillars[4]; and the porch opening is on the east, on the side of the porch, while the warrant residence's porch opens to the north, on the front of the porch and house. The warrant residence has a single roof elevation and is clearly a two-story building considerably higher than the plaintiffs' house. The plaintiffs' house has two roof elevations, which are observable from the front of the house.[5] The plaintiffs' house is separated from the warrant house by three houses and perhaps a vacant lot.

Detective Buckner led a briefing at the Sheriff's offices for the deputies who were to participate in the execution of the warrant. No information on the content of this briefing was submitted. The team drove to the scene in several vehicles with Detective Buckner in possession of the warrant. At that time, defendant Tomey was a Captain and the Commander of the Sheriff's Special Investigations Unit which included the Narcotics Unit. Neither Sergeant McAtee nor Captain Tomey (we will refer to the ranks the defendants had at that time) rode to the scene with Detective Buckner and, contrary to policy, Detective Buckner did not ride to the scene with his F.T.O. The team entered West Chelsea Road from the east, off of Morris Street, and parked their vehicles to the east of the plaintiffs' driveway. Detective Buckner identified the plaintiffs' house as the warrant residence to Sergeant McAtee and Captain Tomey.

Because two male subjects were visible inside the front of the house (through the glass in the front door and a window), the officers executing the warrant wanted to enter quickly, with minimal exposure. The officers entered through the front door of the plaintiffs' house by turning the door knob on the unlocked front door. The officers were in the process of securing the premises when Detective Buckner realized that the plaintiffs were not the people named in the warrant.[6] Detective Buckner notified Sergeant McAtee and Captain Tomey of the error and Sergeant McAtee and Captain Tomey ordered all officers out of the house.

The defendants did not damage the plaintiffs' real or personal property. Only one of the plaintiffs was handcuffed. Deputies pointed firearms at the plaintiffs, collected and detained them together in the front room, and had some physical contact with plaintiffs. None of the plaintiffs sustained personal physical injury at the hands of the defendants.

## II. Claims, defenses, and rulings.

Count 1 of the First Amended Complaint asserted federal constitutional tort claims under 42 U.S.C. § 1983 against all the defendants. Count 2 asserted Indiana common law tort claims against the Sheriff of Marion County and Indiana constitutional tort and statutory claims against all the defendants.[7]

4. We noted in our summary judgment ruling that it appeared, from photographs submitted with Detective Buckner's affidavit and the plaintiffs' response, that the warrant residence has three or four tapered wood porch pillars above its yellow brick half-wall.

5. The plaintiffs' statement reads: "Plaintiffs' house has two (2) roof elevations, but does not appear to be a two (2) story home. It is clearly a single story house." The defendants' Reply to Plaintiffs' Statement of Additional Material Facts stated that "Defendants dispute that plaintiffs' house is 'clearly a single story house'" Because we do not perceive a significant difference between the plaintiffs' residence "not appearing to be a two-story house" and it "clearly being a single story house", we assume the defendants dispute both characterizations.

6. In his affidavit submitted in support of the defendants' motion for summary judgment, Detective Buckner averred: "As we began to secure the premises, I realized the people in the home did not appear to be the right age as the people at 5201 West Chelsea. I asked Odealia Turner her name, and when she told me, I checked the paperwork and realized the names did not match." The warrant does not include names or ages of residents of the warrant residents and neither party submitted or referred to Detective Buckner's probable cause affidavit on the motion for summary judgment.

7. After our summary judgment rulings, the plaintiffs filed the now-operative Second Amended Complaint that reflected those rulings and made other minor changes.

## A. Federal claims.

In their complaint, the plaintiffs claimed that defendants Buckner, McAtee, and Tomey violated their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures when the defendants entered and searched the plaintiffs' residence without probable cause, a warrant, or exigent circumstances; failed to knock and announce before entering; and used excessive force against the plaintiffs. The plaintiffs assert that the individual defendants are liable for their affirmative actions and for their failures to intervene to prevent the violations by other defendants and other deputies. The plaintiffs also claimed that the Sheriff of Marion County is liable for these violations based on *respondeat superior* liability and the Sheriff's policy, practice, or custom of failing to properly train and supervise his deputies for the execution of search warrants and his practice of encouraging his deputies to not intervene to prevent violations of constitutional rights. The plaintiffs allege that the defendants' conduct was motivated by evil motive or involved reckless or callous indifference to the plaintiffs' rights. They pray for compensatory and punitive damages.

Defendants McAtee and Tomey asserted that they enjoyed qualified immunity from the plaintiffs' § 1983 claims for the mistaken entry into the plaintiffs' residence because they reasonably followed the lead of detective Buckner when he identified the plaintiffs' house as the warrant residence. We also assumed that Detective Buckner was asserting qualified immunity for the wrongful entry. All the defendants asserted qualified immunity from the plaintiffs' excessive force claims arguing that the force allegedly used was not excessive as a matter of law and that a reasonable officer in the circumstances would not have known that the force used was excessive. We also assumed that the defendants moved for qualified immunity and summary judgment on the plaintiffs' knock and announce claims.

### 1. Qualified immunity for unlawful entry claims denied.

We ruled that the defendants' qualified immunity defense for the unlawful entry was forfeited because they failed to adequately develop their argument factually or legally. Alternatively, we addressed the merits of the defendants' argument.[8] We found that the question of whether reasonable officers in Sergeant McAtee's and Captain Tomey's positions would have known that deferring to Detective Buckner's identification of the warrant residence was unreasonable depends in part on their previous awareness of the identifying features of the warrant residence (from, for example, Detective Buckner's pre-execution briefing) and their own observations of those features at the scene, yet no evidence of those facts was presented on the motion for summary judgment. We found other facts relevant to the inquiry missing as well. For safety reasons, Sergeant McAtee made the decision to approach the warrant residence by a route with which Detective Buckner was less (if at all) familiar and, contrary to policy, Detective Buckner, still in training, drove to the site separately from his F.T.O. Yet the evidence presented on the motion for summary judgment does not indicate whether Sergeant McAtee or Captain Tomey at that time were aware of Detective Buckner's unfamiliarity with the approach to the warrant residence or that he was unaccompanied by his F.T.O., who had surveyed the residence with him earlier in the day. It is unclear how much of the identifying details of the warrant residence Sergeant McAtee or Captain Tomey knew and whether they took reasonable steps to identify the warrant residence themselves or to check or confirm Detective Buckner's identification of the warrant residence —

---

**8.** The defendants did not argue that the Fourth Amendment's reasonableness standard for unlawful entries was not clearly established at the time of the search or that a reasonable officer in the defendants' positions would not have been aware of the standard. The only issue was whether a reasonable officer in the defendants' positions would have known that his or her actions or omissions violated the standard.

perhaps with his presumably equally-knowledgeable F.T.O. who was present. In light of the facts that Detective Buckner was a trainee, that this was his first warrant execution, and that he was separated from his F.T.O., the only other member of the team who had seen the warrant residence, we held that a jury could reasonably conclude that a failure of Sergeant McAtee and/or Captain Tomey to take steps to confirm Detective Buckner's identification of the warrant residence was unreasonable and violated the Fourth Amendment.

Finally we concluded that there were enough significant differences between the features and locations of the warrant residence and the plaintiffs' house, and enough question about the adequacy of the defendants' efforts at accurate identification, that a jury could reasonably conclude that the defendants' mistaken identification was not reasonable and, therefore, neither Detective Buckner, Sergeant McAtee, nor Captain Tomey were protected by qualified immunity. The parties did not discuss on summary judgment, and we did not address, whether the defendants enjoyed qualified immunity for any failure to withdraw from the plaintiffs' house sooner than they did.

## 2. Summary judgment on excessive force claims denied in part and conditionally granted in part.

The plaintiffs alleged the following uses of excessive force:

(1) Upon entry into the house, an officer pointed a gun at Odealia Turner's forehead and repeatedly shouted at her to get down on the floor. The gun was pointed at her until she sat down on the couch.[9]

(2) Upon entry into the house, an officer pointed a gun at Bruce Turner's face, he was pushed to the floor face-down, and he was forcibly handcuffed.[10] The duration of "contact" was 10–15 minutes.

(3) A female officer knocked on the door to the bathroom where Kathleen Turner was showering and yelled asking if anyone was in the bathroom. Kathleen answered the door in a towel and stood there for about five minutes while the female officer ignored her requests to put on clothes and join her mother. While she stood there, several male officers passed by. Odealia Turner also avers that McAtee "pulled my daughter out of the shower and made her stand in the hall in front of the rest of the men." Kathleen eventually joined the rest of her family in the front room, still dressed in a towel.

(4) Jason Turner alleges that Captain Tomey held a gun to his head. When Jason couldn't comply with Captain Tomey's command to raise his arms because of a slight handicap in his left arm, Captain Tomey began to yank Jason's left arm. Captain Tomey continued to yank Jason's arm and command him to raise it after being told about his handicap.

---

**9.** In some of their allegations, the plaintiffs did not identify the specific deputy or deputies who were the actors. However, we did not find this deficiency to be fatal to those claims. The Court of Appeals for the Ninth Circuit so held in a similar case:

All of the officers who admit to having been inside the Saddlecreek premises during the execution of the warrant were participants in the detention of the Listons, not merely those officers who used force to handcuff Jim Liston. Because we have concluded that there is sufficient evidence to raise a genuine issue of fact regarding the reasonableness of the Listons' detention, those officers who by their presence in the home assisted in restraining them ... are not entitled to summary judgment. We also

note in support of our conclusion that we have in some circumstances denied summary judgment even though plaintiffs could not state with certainty which officers had violated their rights.

*Liston v. County of Riverside*, 120 F.3d 965, 981 (9th Cir.1997) (citations omitted). *See Baker v. Monroe Township*, 50 F.3d 1186, 1193–94 (3rd Cir.1995) (although not participating themselves, ranking officers are liable for their knowing acquiescence in the conduct of officers under their supervision).

**10.** Bruce Turner states at one point that he "complied [with an officer's order to get on the floor] putting my arms behind my back ...", and at another point, that an officer "forced arms behind back".

Again, none of the plaintiffs allege that they suffered physical injuries as a result of the defendants' uses of excessive force. The plaintiffs' claims of excessive force also encompass all uses of force by the deputies because the plaintiffs allege that the deputies entered the plaintiffs' house unlawfully and, if their initial entry is found to be lawful, then their claims include all uses of force after the deputies should have retreated from the house.

We concluded that, when lawfully executing a search warrant on premises believed to house a narcotics distribution operation, it is a reasonable use of force for law enforcement officers to secure the premises and protect themselves by pointing weapons at the occupants, putting them on the floor, and handcuffing them.[11] *See Michigan v. Summers,* 452 U.S. 692, 701–03, 101 S.Ct. 2587, 2593–94, 69 L.Ed.2d 340 (1981);[12] *Torres v. United States,* 200 F.3d 179, 184–87 (3rd Cir.1999); *Baker,* 50 F.3d at 1191–93; *Tom v. Voida,* 963 F.2d 952, 957–59 (7th Cir.1992); *United States v. Laing,* 889 F.2d 281, 285–86 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1306, 108 L.Ed.2d 482 (1990); *Wilkins v. May,* 872 F.2d 190, 194 (7th Cir.1989), *cert. denied,* 493 U.S. 1026, 110

S.Ct. 733, 107 L.Ed.2d 752 (1990). We found, therefore, that the defendants are conditionally entitled to summary judgment on these claims: if the jury finds that their mistaken entry into the plaintiffs' house was reasonable, then the defendants would enjoy qualified immunity for pointing their weapons at the plaintiffs, putting Bruce Turner on the floor, and handcuffing Bruce Turner. Because the defendants did not develop qualified immunity arguments regarding other uses of force, including force used against Kathleen and Jason Turner, qualified immunity was denied as to these claims.

### 3. Summary judgment on knock and announce claims denied.[13]

The defendants argued for qualified immunity and summary judgment on the knock and announce claims on the ground that there is no genuine dispute of fact there was a knock and announcement. The defendants did not argue that exigent circumstances excused a knock and announcement. We found that the plaintiffs' affidavits, in which they averred that no knock or announcement was given before the deputies entered, were sufficient to create a genuine issue of material fact

11. The parties did not dispute that the law on excessive use of force was clearly established at the time and that a reasonable officer would have known of the standard.

12. "In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the 'articulable facts' supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Finally, the orderly completion of

the search may be facilitated if the occupants of the premises are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." *Summers,* 452 U.S. at 702–03, 101 S.Ct. at 2594 (citation and footnote omitted).

13. Although we did not rely upon it in our summary judgment entry, another ground for denying the defendants' qualified immunity motion might be the delay in presenting it. Qualified immunity is not only a defense to the substance of a plaintiff's claims but an immunity from the litigation. If, without good cause, a defendant waits too long to assert the immunity and thus allows himself to be subjected to the expense and effort of the litigation, he has demonstrated that he does not need the protection the qualified immunity affords or he has wasted the court's and the plaintiff's time and expense. Either way, he has forfeited the benefit of the immunity.

about whether a proper knock and announce was given. All of the defendants averred that they entered the plaintiffs' house by turning the doorknob and entering the unlocked door.

### 4. Summary judgment granted on *respondeat superior* claims.

The plaintiffs conceded in their summary judgment response that the Sheriff of Marion County cannot be held vicariously liable under § 1983 and summary judgment was accordingly granted on those claims.

### 5. Summary judgment granted on failure to train claims.

Because the plaintiffs did not respond to the defendants' motion for summary judgment on the plaintiffs' *Monell* claim that the Sheriff of Marion County failed to adequately train the defendants, we granted the defendants' motion.

### 6. Summary judgment granted on failure to supervise claims.

To support their claims that the Sheriff had a policy, practice, or custom of failing to adequately supervise his deputies, the plaintiffs relied only on the fact that Detective Buckner rode to the plaintiffs' house without his F.T.O. and the alleged fact that neither Sergeant McAtee nor Captain Tomey took steps to make sure that Detective Buckner properly identified the warrant residence. Because the plaintiffs failed to show more than this one incident and failed to show the decision of a responsible policy maker, summary judgment was granted on those claims.

### 7. Summary judgment granted on punitive damages claims.

Because the plaintiffs conceded in their response that they are not entitled to punitive damages against the Sheriff under § 1983, summary judgment was granted on those claims.

### 8. Qualified immunity on failure to intervene claims denied.

The defendants moved for qualified immunity against only the plaintiffs' § 1983 excessive force claims against the individual deputy sheriffs. As noted above, we ruled that summary judgment on the claims that the defendant deputies used excessive force by pointing weapons at the plaintiffs, putting them on the floor, and handcuffing them depends on whether the original entry into the plaintiffs' house and any failure to knock and announce were reasonable mistakes. Similarly, we ruled that the defendants' qualified immunity for failing to intervene to prevent the same uses of force depends on the reasonableness of the entry and any failure to knock and announce. With respect to other uses of force inside the plaintiffs' house, we ruled that there are sufficient genuine disputes of material fact to prevent a finding that reasonable officers in the defendants' positions would have known that failing to intervene to prevent the uses of force alleged would have been unreasonable.

### B. State common law claims.

The plaintiffs claimed that the defendants are liable for (1) violation of their rights against unreasonable searches and seizures under Article 1, § 11 of the Indiana Constitution, (2) wrongful entry under Indiana Code § 35–33–5–7(e), and common law (3) trespass, (4) false arrest, (5) battery, and (6) confinement under the Indiana Tort Claims Act. Although the First Amended Complaint literally asserted all of the state law claims against only the Marion County Sheriff, we construed, and later ruled specifically, that the claims under the Indiana Constitution and I.C. § 35–33–5–7(e) are asserted against all of the defendants.

Under the Indiana Tort Claim Act, the plaintiffs may assert their common law tort claims against only the Sheriff. Indiana Code Annotated § 34–13–3–5(a) (Burns 1998) ("A judgment rendered with respect to or a settlement made by a governmental entity bars an action by the claimant against an employee whose conduct gave rise to the claim resulting in that judgment or settlement. A lawsuit alleging that an employee acted within the scope of the employee's employment must be exclusive to the complaint and bars an

action by the claimant against the employee personally"). The plaintiffs have consistently alleged in each of their three complaints that the defendant deputy sheriffs acted within the course and scope of their employment.[14]

### 1. Summary judgment on battery claims denied in part and conditionally granted in part.

Citing *Kemezy v. Peters*, 622 N.E.2d 1296 (Ind.1993), the Sheriff conceded that the defendants owed a private duty to the plaintiffs to refrain from using excessive force against the plaintiffs during the search and, therefore, the Tort Claims Act's "enforcement of law" immunity, I.C. § 34–13–3–3(7), does not apply to the plaintiffs' battery claims.[15] The plaintiffs did not dispute the Sheriff's argument that the "plaintiffs' claims sounding in battery . . . that they had guns pointed at them and one of them was handcuffed" was a reasonable and privileged use of force incident to an arrest or detention and did not amount to battery as a matter of state law. Therefore, parallel to our rulings on the plaintiffs' excessive force claims under the Fourth Amendment, we conditionally granted the Sheriff's motion for summary judgment and ruled that the defendants' actions in pointing guns at the plaintiffs and putting Bruce Turner on the floor and handcuffing him were reasonable uses of

force if the defendants' presence in the house was lawful. In other words, the Sheriff's liability for battery depends on whether the jury finds that the defendants' mistaken entry into the plaintiffs' house, and any failure to knock and announce, were reasonable under the Fourth Amendment and Section Eleven. The parties did not address and we made no ruling on other touchings by the defendants, specifically the touchings of Kathleen and Jason Turner except for the pointing of weapons at them.

As noted in the following section, the question of whether § 3(7)'s immunity applies to the plaintiffs' excessive force claims is certified to the Indiana Supreme Court.

### 2. Summary judgment on trespass and confinement claims denied.

The Sheriff of Marion County argued that the Indiana Tort Claims Act immunizes him from the plaintiffs' claims for trespass and confinement pursuant to I.C. §§ 34–13–3–3(7) (enforcement of a law), (12) (authorized entry onto land), and (13) (unintentional misrepresentation).[16] The Sheriff argued that § 3(7) immunity applied because the deputies were in the process of attempting to enforce the state's drug laws by serving a valid warrant on suspected drug dealers. The plaintiffs re-

---

**14.** We note that the defendants have waived any non-compliance by the plaintiffs with the notice requirements of the Tort Claims Act. The defendant deputies entered the plaintiffs' house on February 24, 1997; the plaintiffs· filed this suit in the Marion County Superior Court on November 25, 1997; and the defendants removed the suit to this Court on December 22, 1997. The plaintiffs did not allege that they submitted a Tort Claims Act notice with the Sheriff and there is no indication in the file that a notice was filed. However, the defendants did not assert non-compliance in any of their answers or in any motion. Defendants can waive the Act's notice requirements by failing to raise the issue of non-compliance. *Delaware County v. Powell*, 272 Ind. 82, 84, 393 N.E.2d 190, 191 (Ind.1979) ("Failure to raise the defense of non-compliance with the statute can also waive the notice requirement"); *McConnell v. Porter Memorial Hospital*, 698 N.E.2d 865, 868 (Ind.Ct.

App.1998), *trans. denied* (*quoting City of Tipton v. Baxter*, 593 N.E.2d 1280, 1282 and n. 1 (Ind.Ct.App.1992)). By this late stage in the litigation, we find that the defendants have waived any failure by the plaintiffs to comply with the notice requirements of the Tort Claims Act.

**15.** The plaintiffs did not complain of assaults by the defendant deputies as distinguished from batteries, but neither side discussed the elements of battery or assault claims in Indiana. Out of caution, we also addressed the defendants' pointing of weapons at the plaintiffs in the context of their battery claims.

**16.** The Sheriff did not argue on the merits that his deputies did not trespass because they reasonably believed that they were executing a valid warrant for the premises. Neither did he argue the merits of the confinement claim.

sponded only that the later-enacted and more specific "wrongful entry" liability created by I.C. § 35–33–5–7(e) supersedes the immunities of the earlier and more general Tort Claims Act. The plaintiffs did not address the merits of any of the specific immunities asserted by the Sheriff and neither side addressed the public-private duty test that *Quakenbush v. Lackey,* 622 N.E.2d 1284 (Ind.1993), and *Kemezy v. Peters,* 622 N.E.2d 1296 (Ind.1993), prescribed for applying § 3(7)'s "enforcement of a law" immunity. In this posture of the parties' arguments, we granted summary judgment on the plaintiffs' trespass and confinement claims on the ground of § 3(7) immunity.[17]

However, while preparing this Entry, we reconsidered and vacated our ruling that I.C. § 34–13–3–3(7) immunizes the Sheriff from liability for trespass and confinement claims.[18] We first reconsidered the definition of the duty to which the *Quakenbush* public-private analysis should be applied: whether it should be the general duty to "enforce the law against growing marijuana in Indiana", as contended by the Sheriff, or the specific duty to accurately identify a warrant residence before execution. During this reconsideration, however, we discovered the Supreme Court's decision in *Benton v. City of Oakland City,* 721 N.E.2d 224 (Ind.1999), which caused us to reconsider our ruling on a more fundamental level and convinced us of the need to certify the question of the meaning of § 3(7) to the Supreme Court.

In its 1993 opinion in *Quakenbush,* the Supreme Court declared the meaning of the "enforcement of a law" immunity of § 3(7):

Accordingly, we hold that Section 3(7) was intended to codify the common law as it existed at the time the Act was passed. The state of the common law was such that governments and their

employees were subject to liability for the breach of private duties owed to individuals, but were immune from liability for the breach of public duties owed to the public at large.

*Quakenbush,* 622 N.E.2d at 1290–91. *See also Kemezy,* 622 N.E.2d at 1297 ("In *Quakenbush,* we held that the legislature intended that Section 3(7) confer immunity only when the plaintiff seeks recovery for the breach of a public duty, but provides no refuge to governmental entities or their employees for the breach of a private duty"). In *Quakenbush,* the Court overruled its previous interpretation of § 3(7) that it immunized only "activities attendant to effecting the arrest of those who may have broken the law", *Tittle v. Mahan,* 582 N.E.2d 796, 801 (Ind.1991), which in turn had overruled the Court's earlier interpretation that § 3(7) immunized all law enforcement activity conducted within the course and scope of employment, except for false arrest and false imprisonment, *Seymour National Bank v. State,* 422 N.E.2d 1223, 1226, *modified on rehearing,* 428 N.E.2d 203 (Ind.1981). In *Quakenbush,* the Court adopted the definition of the public-private duty test described by Judge Robertson in his opinion for the Court of Appeals in *Seymour:*

[Judge Robertson] concluded that the term "enforcement of the law" rendered Section 3(7) ambiguous and ultimately concluded "that the legislature intended enforcement to mean at least that the decision to enforce and the end result thereof upon the object of the enforcement (within the bounds of law) is protected activity and will not give rise to a civil action for damages." In other words, he reasoned that the decision of whether or not to investigate a crime, whether to arrest a particular individual for committing a crime, and the arrest itself were protected activities so long as

---

**17.** Our summary judgment ruling did not address §§ 3(12) or 3(13) in relation to the trespass and confinement claims, but our ruling, discussed in the next section, that these immunities do not apply to the plaintiffs' false

arrest and false imprisonment claims would apply here as well.

**18.** The plaintiffs dropped their claim for confinement from the Second Amended Complaint.

the acts are otherwise conducted legally.....

We believe this analysis comports with the legislature's intent when it drafted Section 3(7). This analysis also gives meaning to the exception in Section 3(7) that immunity does not apply if an officer's conduct results in false arrest or false imprisonment.

*Quakenbush*, 622 N.E.2d at 1289–90 (citations omitted). Based on this standard, *Quakenbush* held that an officer traveling to the scene of a crime is not immune from civil liability for negligence because police officers have a private duty to use reasonable care when driving their vehicles. Presumably, the reason was because driving to the scene of a crime does not involve the decision whether to investigate a crime, whether to arrest a suspect, or an arrest itself. In *Kemezy*, decided the same day as *Quakenbush*, the Court held that police officers owe a private duty to refrain from using excessive force during an arrest and therefore are liable for intentional batteries committed during an arrest. Although the Court did not trace out its rationale in *Kemezy*, presumably it concluded that an intentional battery on an arrestee, although involving the "end result [of a "decision to enforce"] upon the object of the enforcement", is not an end result that is "within the bounds of law", *Quakenbush*, 622 N.E.2d at 1289, or that, while it is an "arrest itself", it is not an arrest "otherwise conducted legally", *id.*, 622 N.E.2d at 1289–90.

In *Benton*, the Supreme Court returned to the standard of governmental common law liability declared in *Campbell v. State*, 259 Ind. 55, 284 N.E.2d 733 (Ind.1972), which culminated the Court's progressive abrogation of governmental immunity in Indiana. In *Campbell*, the Court held that governmental entities would thenceforth be liable for any "duty owed to a private individual", meaning that governmental entities would be liable under the same "common law duty to use ordinary and reasonable care under the circumstances" that applies to non-governmental entities. The Court reserved three areas where sovereign immunity would remain: claims that a governmental entity failed to provide adequate police protection to prevent crime, that a state official appointed a negligent individual, and that challenge judicial decision making. *Benton*, 721 N.E.2d at 227, 228. *Benton* made clear that governmental entities face common law liability for all claims unless "the duty alleged to have been breached is so closely akin to one of the limited exceptions (prevent crime, appoint competent officials, or make correct judicial decisions) that it should be treated as one as well." *Id.* at 230. The Court specifically rejected the public-private duty test which was predominantly applied to determine common law liability, explaining that the development of that test was a departure from *Campbell*'s simple holding and had resulted in an unworkable, convoluted, highly abstract, and almost metaphysical analysis. Although the Court was careful to limit its discussion to the scope of governmental entities' common law liability and explicitly disclaimed any consideration of the Tort Claims Act's immunities, particularly *Quakenbush*'s public-private duty analysis for § 3(7), *id.*, 721 N.E.2d at 226 n. 2, 231–32,[19] *Benton*'s rationale appears nonetheless to undermine the basis for *Quakenbush*'s interpretation of § 3(7).

*Benton* explained that "[f]or a brief period following *Campbell*, courts correctly concluded the phrase 'duty owed to a private individual' was nothing more than a synonym for 'duty of reasonable care'", *Benton*, 721 N.E.2d at 228, and that the

---

**19.** The Court nonetheless hinted that it approved of some aspect of *Quakenbush*'s interpretation: *"Quakenbush v. Lackey* employed the concept of private duty to analyze the availability of one of the ITCA's immunity defenses. As a general matter, we find *Quakenbush*'s concept of private duty consonant with the 'duty owed to a private individual' discussed *supra*, especially in Part I–B. However, detailed discussion of this point (as well as the interaction of common law principles and statutory immunities) is beyond the scope of this opinion." *Benton*, 721 N.E.2d at 232 n. 15.

"convoluted analysis that seemed to support an entirely separate test for duty in cases involving a governmental defendant" began shortly thereafter, *id.,* at 228–29. *Benton's* description of the state of the common law at the time the Tort Claims Act was enacted inevitably informs the interpretation of § 3(7) because *Quakenbush* and most opinions addressing the legislative purpose behind § 3(7) hold that the General Assembly intended § 3(7) to codify the common law existing at the time of enactment. The two cases cited in *Benton* as representative of the "brief period" of correct judicial expression of the common law of governmental liability after *Campbell* were decided on March 22, 1974 and February 28, 1974.[20] *Id.,* at 228. The Tort Claims Act, including § 3(7)'s "enforcement of a law" immunity in its present relevant form,[21] was enacted on February 19, 1974, Acts 1974, P.L. 142, § 1, during this "brief period" of correct interpretation that § 3(7) codified. A review of the decisions *Benton* cites that progressively abrogated governmental immunity confirms this reading of the contemporary common law because a public-private duty analysis for governmental liability does not figure in any of the opinions. The decisions cited by *Benton* as representative of the caselaw's unfortunate divergence into public-private duty, special duty, and other

tests for governmental liability were decided in 1975, 1978, 1979, and later, after the enactment of § 3(7). *Benton,* 721 N.E.2d at 228–29. It appears, then, that the public-private duty distinction was not part of the "common law as it existed at the time the Act was passed", which *Quakenbush* held the General Assembly codified in § 3(7). *Quakenbush,* 622 N.E.2d at 1290, 1290–91; *Kemezy,* 622 N.E.2d at 1297.

Thus, our impasse over the proper interpretation of § 3(7)'s immunity for enforcement of laws. If we follow that part of *Quakenbush's* and *Kemezy's* holdings that the General Assembly intended to codify the existing common law of governmental liability in § 3(7), and that part of *Benton* (and the caselaw) that describes the state of the common law at the time, then we would likely hold that § 3(7) does not immunize the Sheriff from the plaintiffs' trespass (or battery) claims because the plaintiffs' claims that the defendant deputies unreasonably misidentified their house as the warrant residence does not appear to constitute a claim that the Sheriff failed to provide sufficient police protection to prevent crime, the relevant category of sovereign immunity reserved in *Campbell.*[22] Although such an interpretation would not render § 3(7) any more superfluous than it is under *Quakenbush* and *Kemezy,*[23] we

**20.** *Miller v. Griesel,* 261 Ind. 604, 308 N.E.2d 701 (Ind.1974), and *Roberts v. State,* 159 Ind. App. 456, 307 N.E.2d 501 (Ind.Ct.App.1974), respectively.

**21.** As originally enacted, the Tort Claims Act provided an immunity for "the enforcement of or failure to enforce a law". Acts 1974, p. 600 (adding § 34-4-16.5-3(7) to the Indiana Code, the predecessor to today's § 34-4-3-3(7)). In 1976, the General Assembly added the clauses on adoption of laws and rules and regulations, as well as the clause excluding claims for false arrest or false imprisonment. Acts 1976, P.L. 140, § 2.

**22.** The plaintiffs' claim clearly does not implicate *Campbell's* "personnel appointment" or "judicial decision making" categories of sovereign immunity.

**23.** If § 3(7) codifies the common law of governmental liability regarding law enforcement

conduct, as *Quakenbush* and *Kemezy* hold, then it immunizes governmental entities against claims for which they are not liable—however that common law is described. In that case, the section's exclusion of false arrest and false imprisonment claims is its primary function. Under *Quakenbush's* public-private duty definition of the immunity and common law liability, these exclusions reflect the assumption that false arrests and false imprisonments implicate public enforcement duties for which governments would enjoy sovereign immunity except for the exclusions. However, it is difficult to square this interpretation with *Campbell's* reserved sovereign immunity (as relevant here) only for claims that inadequate policing failed to prevent crime. But then it is also difficult to explain the purpose of § 3(7)'s exclusions for false arrest and false imprisonment under *Campbell's* and *Benton's* scheme of general governmental liability except for claims that inadequate policing failed to prevent crime. Plaintiffs don't

are reluctant to take such a significant departure from the standard established in *Quakenbush* that *Benton* was so careful not to overrule without authoritative guidance from the Supreme Court. The alternative is to reject either *Quakenbush*'s holding that the General Assembly intended to codify the common law or *Benton*'s reading of that common law, and follow *Quakenbush*'s public-private duty standard for immunity under § 3(7). We found no Indiana decisions applying *Quakenbush*'s standard to officers' search of a residence, but because executions of search warrants involve the "decision to enforce and the end result thereof upon the object of the enforcement" — in other words, the decision whether to investigate a crime, whether to search a particular location, and the search itself[24] — we would be inclined to find that the deputies were engaged in a public duty which is immunized under § 3(7). We are understandably reluctant on our own to reject either proposition from *Quakenbush* or *Benton* and apply a public-private duty analysis which *Benton* criticizes. Moreover, we cannot see how *Quakenbush*'s public-private duty analysis for § 3(7) can practically be severed from the legislative intent holding on which the Court so firmly based it. With these conflicting standards and rationales, we face the dilemma of picking and choosing which parts of Indiana Supreme Court decisions to accept and which to reject on a question of first impression. As we read it, *Benton* undermines, if not abrogates, the holdings of *Quakenbush* and *Kemezy* on the meaning of § 3(7) and we are unable to predict which course the Supreme Court will take.

We conclude that, in the present state of the caselaw, § 3(7)'s phrase "enforcement of or failure to … enforce a law" is ambiguous, which leaves "no, clear controlling precedents in the decisions of the Supreme Court" on the meaning of § 3(7), Ind. R.App.P. 15(O). We have decided, therefore, to certify the question of the meaning of § 3(7) to the Supreme Court for further instruction. We also conclude that this is not the type of question that is likely to produce a "fact bound, particularized decision lacking broad precedential significance" and counsels against certification. *See Erie Insurance Group v. Sear Corp.*, 102 F.3d 889, 892 (7th Cir.1996).

**3. Summary judgment on false arrest and false imprisonment claims denied in part and conditionally granted in part.[25]**

Because false arrest and false imprisonment claims are specifically exempted from the Tort Claims Act's immunity for enforcement of laws, the Sheriff asserted the immunities of I.C. §§ 34–13–3–3(12) and (13). The plaintiffs did not address these immunities in their response and the Sheriff did not supply legal authorities in support. The Sheriff argued that § 3(12) applies because his deputies "believed they were entering onto land for which they held a valid search warrant". Narrowly interpreting § 3(12) (because it is contrary to the common law of general liability), we concluded that it established an objective, not a subjective, test, and therefore held that the statute requires the entry onto land to be authorized in fact, not that officers have a good faith and/or reason-

sue for a false arrest on the ground that the police thereby lost an opportunity to pursue real criminals.

24. We do not read *Quakenbush* as restricting § 3(7)'s immunity to full custodial arrests; we assume that it encompasses all enforcement activities that might not result in custodial arrests as well, such as searches, investigations, *Terry* stops, and seizures of contraband.

25. Although the First Amended Complaint, to which the defendants' motion for summary judgment was directed, asserted a claim only

for false arrest, the plaintiffs included false imprisonment in their response argument and the defendants included it in their reply. We therefore included false imprisonment in our summary judgment discussion on the false arrest claim. The parties did not suggest that there were any differences between the two actions as far as standards or remedies. The now operative Second Amended Complaint, which was filed after our summary judgment Entry was issued, states both false arrest and false imprisonment claims. Second Amended Complaint, Factual Allegations, ¶ 15, Count II, ¶ 3.

able belief that their entry was authorized by law. There is no dispute in this case that, because the defendants had neither probable cause, a warrant, nor exigent circumstances to enter the plaintiffs' house, their entry onto the plaintiffs' land was not in fact authorized by law. Therefore, we ruled that § (12) does not immunize the Sheriff against the plaintiffs' false arrest and false imprisonment claims.

We also rejected the Sheriff's argument that § 3(13)'s immunity applies because the plaintiffs' deprivations resulted from Detective's Buckner's unintentional misrepresentation to his fellow officers that the plaintiffs' house was the warrant residence. Again, we were not supplied with developed legal arguments or authoritative interpretations of § 3(13), particularly regarding the proximity of causation required. In this context, we did not interpret the immunity as broadly as the Sheriff urged. We found that the plaintiffs do not claim that their injuries and deprivations of rights resulted from Detective Buckner's communications to his fellow officers, but from the defendants' wrongful entries into their house. In the absence of authoritative state decisions and in recognition of the principle that statutes in derogation of the common law are to be narrowly construed, we interpreted § 3(13) to require that the misrepresentation itself be the act that directly and immediately caused plaintiffs' injuries. In addition, we noted that, even if the Sheriff's construction of § 3(13) were accepted, he would not be immunized from liability for Detective Buckner's conduct because Detective Buckner entered the plaintiffs' house not because he communicated his mistaken identification of the house to the other officers, but because he mistakenly identified the house. Moreover, the Sheriff would not be immunized from liability for Sergeant McAtee's or Captain Tomey's entries into the plaintiffs' property to the extent that they unreasonably followed Detective Buckner's lead. *Hinshaw v. Board of Commissioners of Jay County*, 611 N.E.2d 637, 640 (Ind.1993).[26]

The plaintiffs did not dispute, and we agreed, that detentions of the type and duration that the plaintiffs experienced would be legal if the warrant the deputies executed was for the plaintiffs' residence. Therefore, we ruled that whether the Sheriff is liable for the plaintiffs' claims of false arrest and false imprisonment will depend on whether the jury finds that the defendant deputies' mistaken entry into the plaintiffs' house violated their rights under the United States and/or Indiana Constitutions. On reconsideration, we clarify only that the legality of the detentions to which the plaintiffs were subjected will depend also on the jury's finding of when the defendant deputies should have discovered their mistake, when they actually did discover their mistake, and how expeditiously they withdrew after discovering their mistake.

### C. State constitutional and statutory claims.

We did not address the plaintiffs' claims based on Article 1, Section 11 of the Indiana Constitution and I.C. § 35–33–5–7(e) because we intended to certify these issues to the Supreme Court.

### D. Summary of existing claims.

The following claims survived our rulings on summary judgment:

---

26. Captain Tomey, the ranking officer at the scene, made the following statements in his affidavit: "We did not re-group in front of the house to have further conversation, since stealth and speed are of the essence when executing a search warrant. I simply followed the lead detective and the rest of the front door team to the front door of 5129 West Chelsea Road. At no time prior to entering the plaintiffs' residence did I hear any conversation or engage in any conversation which would indicate that we were not at 5201 West Chelsea Road." Tomey Affidavit, ¶¶ 9 and 10. See *Blake v. Peterson*, No. 94–C–6561, Memorandum Opinion and Order, 1995 WL 360702, *8, 1995 U.S.Dist.Lexis 8222, *22 (N.D. Ill., June 14, 1995) ("absent exigent circumstances, compliance with the Fourth Amendment should not rest upon whether an officer had enough time to gather sufficient facts to establish a reasonable belief" that a targeted residence is accurately identified).

1. Section 1983 claims for compensatory damages, punitive damages, and attorney's fees (under 42 U.S.C. § 1988) against the individual deputies for the following alleged violations of the plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution:

a. Entering the plaintiffs' house without a warrant or probable cause and without taking reasonable steps to ensure the accurate identification of the warrant residence and failing to immediately retreat when they discovered or should have discovered their mistake.

b. Failing to knock and announce before entering the plaintiffs' house in the absence of exigent circumstances.

c. Using excessive force against the plaintiffs. If the jury finds that the deputies' mistaken entries into the plaintiffs' house were reasonable and that the knock and announce requirement was satisfied or excused, then the plaintiffs' claims of excessive force are limited to the force used against Kathleen and Jason Turner except for the pointing of weapons at them and any uses of force occurring after the defendant deputies should have withdrawn. If the jury finds that the deputies' mistaken entries were not reasonable or that any failure to knock and announce was not excused, then the plaintiffs' claims of excessive force include all uses of force against all the plaintiffs from the moment of entry into the plaintiffs' house.

d. Failing to intervene to prevent or stop these violations of the plaintiffs' rights.

2. State common law tort claims against the Sheriff of Marion County for compensatory damages:

a. Battery for the deputies' unlawful touching of the plaintiffs. If the jury finds that the deputies' mistaken entries into the plaintiffs' house were reasonable and that the knock and announce requirement was satisfied or excused, then the plaintiffs' claims of battery are limited to the touchings of Kathleen and Jason Turner, except for the pointing of weapons at them and any touchings occurring after the deputies should have withdrawn from the house. If the jury finds that the deputies' mistaken entries were not reasonable or that any failure to knock and announce was not excused, then the plaintiffs' claims of excessive force include all uses of force against all the plaintiffs from the moment they entered the plaintiffs' house.

b. Trespass for the deputies' allegedly unlawful entry into the plaintiffs' house and any failure to withdraw after they discovered or should have discovered their mistake.

c. False arrest and false imprisonment for the deputies' unlawful detentions of the plaintiffs. If the jury finds that the deputies' mistaken entry into the plaintiffs' house was reasonable and that any failure to knock and announce was excused, then the plaintiffs' claims of false arrest and false imprisonment are limited to the detentions that occurred after the deputies did or should have discovered their mistake but failed to withdraw.

3. Claims for "wrongful entry" under I.C. § 35–33–5–7(e) against the deputies and the Sheriff for compensatory and punitive damages.

4. Claims for compensatory and punitive damages against the deputies and the Sheriff for violating Article 1, Section 11 of the Indiana Constitution by unreasonably entering the plaintiffs' house, failing to knock and announce before entering, failing to withdraw when the mistake was or should have been realized, and using excessive force against the plaintiffs.

### III. Certification analysis.

In order to determine the questions needing to be certified and to ensure that the answers are necessary, we examine the differences in standards, defendants, and remedies under each of the claims and legal theories asserted.

## A. Entering and searching the plaintiffs' house.

The plaintiffs assert four legal theories to support their causes of action against the defendants for entering and searching their house.

### 1. § 1983, Fourth and Fourteenth Amendments to the United States Constitution.

■ The Fourth Amendment, applicable to the states through the Fourteenth Amendment, prohibits unreasonable searches and seizures. Law enforcement officers who execute a warrant on the wrong residence violate the residents' Fourth Amendment rights if the officers fail to make an objectively reasonable effort to accurately identify the place to be searched. *See Maryland v. Garrison,* 480 U.S. 79, 87–89, 107 S.Ct. 1013, 1018–19, 94 L.Ed.2d 72 (1987) (standard is whether "officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment"); *Hartsfield v. Lemacks,* 50 F.3d 950, 955 (11th Cir.1995) ("absent probable cause and exigent circumstances, a warrantless search of a residence violates the Fourth Amendment, unless the officers engage in reasonable efforts to avoid error"); *Dawkins v. Graham,* 50 F.3d 532, 534 (8th Cir.1995) ("the execution of a valid warrant on the wrong premises violates the Fourth Amendment if the officers should know the premises searched are not the premises described in the warrant, i.e., the officers' mistake is not objectively reasonable"); *Hill v. McIntyre,* 884 F.2d 271, 276 (6th Cir.1989) (a mistake is unreasonable if officers act recklessly). Even if the initial entry into a residence results from an objectively reasonable mistake, the Fourth Amendment requires officers to retreat as soon as they discover or reasonably should discover their mistake. *See Garrison,* 480 U.S. at 87, 107 S.Ct. at 1018; *Tierney v. Davidson,* 133 F.3d 189, 197–99 (2nd Cir. 1998); *Liston,* 120 F.3d at 978 ("the reasonableness of the detentions does not turn on the total amount of time involved but on when a reasonable officer would have known that a serious error had occurred and that the search should be terminated"); *Baker,* 50 F.3d at 1192; *Pray v. City of Sandusky,* 49 F.3d 1154, 1159 (6th Cir.1995).

■ *Respondeat superior* liability is not available in § 1983 actions, *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), and we have granted summary judgment against the plaintiffs' direct liability claims against the Sheriff of Marion County. Therefore, the plaintiffs claims are against only the individual defendant deputies.

■ Under § 1983, plaintiffs may recover compensatory damages for emotional distress. *Memphis Community School District v. Stachura,* 477 U.S. 299, 306–07, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986) (ordinary tort damages are available under § 1983, including " 'impairment of reputation ..., personal humiliation, and mental anguish and suffering' "). *See Sims v. Mulcahy,* 902 F.2d 524, 532–33 (7th Cir. 1990), *cert. denied,* 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990). General, or presumed, compensatory damages may be awarded in the absence of proof of injury for Fourth Amendment deprivations. *Stachura,* 477 U.S. at 310–11, 106 S.Ct. at 2544–45; *Hessel v. O'Hearn,* 977 F.2d 299, 301–02 (7th Cir.1992). Punitive damages are available when "the defendants' conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Kolstad v. American Dental Association,* 527 U.S. 526, 119 S.Ct. 2118, 2125, 144 L.Ed.2d 494 (1999); *Kyle v. Patterson,* 196 F.3d 695, 697–98 (7th Cir.1999). Punitive damages are available on proof by a preponderance of the evidence. *Karnes v. SCI Colorado Funeral Services, Inc.,* 162 F.3d 1077, 1081 (10th Cir.1998). Prevailing plaintiffs may recover their attorney's fees. 42 U.S.C. § 1988.

984

## 2. Common law tort of trespass.

 A plaintiff in an Indiana trespass action must prove that he was in possession of the land in question and that the defendant entered the land without right. *Calumet National Bank v. American Telephone & Telegraph Co.*, 682 N.E.2d 785, 788 (Ind.1997); *Indiana Michigan Power Co. v. Runge*, 717 N.E.2d 216, 227 (Ind.Ct.App.1999). After lawfully entering land, a defendant may become a trespasser if he fails to leave when his presence is no longer lawful. *See Indianapolis Street Railway Co. v. Hockett*, 161 Ind. 196, 200–01, 67 N.E. 106, 108 (Ind. 1903). Neither an intruder's motive or intent for entering premises nor his reasonable, good faith belief that he had a right to enter the premises are relevant to liability for trespass; his mental state is relevant only to the availability of punitive damages. *Moyer v. Gordon*, 113 Ind. 282, 284–85, 14 N.E. 476, 477 (Ind.1887); *Hawke v. Maus*, 141 Ind.App. 126, 129–30, 226 N.E.2d 713, 715 (Ind.App.1967); *American Sand and Gravel Co. v. Spencer*, 55 Ind.App. 523, 527, 529, 103 N.E. 426, 427, 428 (Ind.App.1913) (distinction between innocent and wilful trespassers). *See* 7 Speiser, Krause, and Gans, *The American Law of Torts* § 23:12, p. 647, § 23:28, p. 686 (1990) (intent is not a test of liability for trespass; mistakes of fact or law, however reasonable, and absence of bad faith are irrelevant). Under the doctrine of trespass *ab initio*, a person who lawfully enters property under color of law (*e.g.*, a government agent or private individual acting under legal authority) then later abuses that authority by a positive act of misconduct will be considered a trespasser *ab initio* and liable in trespass for his acts from the first moment of his entry. *Burton v. Calaway*, 20 Ind. 469, 471 (Ind.1863); *Ferguson v. Day*, 6 Ind. App. 138, 144, 33 N.E. 213, 214 (Ind.App. 1893); *Spades v. Murray*, 2 Ind.App. 401, 405, 28 N.E. 709, 710 (Ind.App.1891); *Bennett v. McIntire*, 121 Ind. 231, 233, 23 N.E. 78, 78–79 (Ind.1889). *See* 28 *Indiana Law Encyclopedia*, "Trespass" § 2, p. 60 (1999); 7 *American Law of Torts* § 23:25, pp. 682– 85; *Prosser and Keeton on the Law of Torts* 5th Ed., § 25, pp. 150–52 (1984).[27]

 Law enforcement officers who enter premises without authority are subject to common law trespass actions. *See, State ex rel. McPherson v. Beckner*, 132 Ind. 371, 374, 31 N.E. 950, 951 (Ind.1892); *McGee v. Givan*, 4 Blackf. 16, notes p. 19 (Ind.1835); *Hollingsworth v. Bates*, 3 Blackf. 340 (Ind.1834); *Levelling v. Leavell*, 2 Blackf. 163 (Ind.1828); *State v. Thomas*, 642 N.E.2d 240, 246 (Ind.Ct.App. 1994), *trans. denied; Stuck v. Yates*, 30 Ind.App. 441, 66 N.E. 177 (Ind.App.1903). Under I.C. § 34–13–3–3(7), governmental defendants enjoy immunity from trespass actions if the plaintiff's loss results from "the . . . enforcement of or failure to . . . enforce a law", the meaning of which, we have discussed above, is uncertain and herein certified.

As noted above, the plaintiffs have consistently alleged that the defendants acted within the scope of their employment and the Sheriff has not answered otherwise. Therefore, the plaintiffs' trespass claims are asserted against only the Sheriff. I.C. § 34–13–3–5(a).

---

**27.** Although the doctrine of trespass *ab initio* has been widely criticized and has been rejected in the Restatement of Torts, *see* 7 *American Law of Torts* § 23:25, pp. 682–85; *Prosser and Keeton on Torts* § 25, pp. 150–52; *Restatement of Torts 2d*, § 214(2) and comments, and although, as the citations in the text testify, the caselaw in Indiana defining the doctrine is old, we have found no decisions overruling the doctrine. Moreover, it has made some relatively recent appearances in the caselaw after the doctrine came under criticism. *See Casselman v. State*, 472 N.E.2d 1310, 1317–18 (Ind.Ct.App.1985); *Indiana & Michigan Electric Co. v. Stevenson*, 173 Ind. App. 329, 336–37, 363 N.E.2d 1254, 1260 (Ind.Ct.App.1977); *Ohio Finance Co. v. Berry*, 34 N.E.2d 152, 153–54 (Ind.App.), *opinion superseded by*, 219 Ind. 94, 37 N.E.2d 2 (Ind. 1941) (we cite the Appellate Court decision only to show that the doctrine was mentioned). We therefore apply it in the cause before us unless instructed to the contrary by the Indiana Supreme Court.

Plaintiffs may recover damages for emotional distress caused by a trespass regardless of physical injury. *Cullison v. Medley,* 570 N.E.2d 27, 30 (Ind.1991) ("When one intentionally invades the premises of another in such a way as to provoke a reasonably foreseeable emotional disturbance or trauma of the rightful occupier of the premises, the occupier may, in addition to recovering damages to the realty, if any, recover damages for such emotional injury"); *Moyer,* 113 Ind. at 288, 14 N.E. at 479 (trespass plaintiff entitled to damages for mental anguish or suffering, injury to pride and social position, sense of shame and humiliation). A jury may award nominal damages in the absence of proven actual damages. *Indiana Pipe Line Co. v. Christensen,* 188 Ind. 400, 407–08, 123 N.E. 789, 792 (Ind. 1919); *Indiana Michigan Power,* 717 N.E.2d at 227; 7 *American Law of Torts* § 23:11, p. 645. Under the Tort Claims Act, the liability of the Sheriff for each plaintiff's combined common law claims is limited to $300,000 and his aggregate liability for all of the plaintiffs' common law claims in this cause is limited to $5,000,000. I.C. § 34–13–3–4. A governmental entity is not liable for punitive damages for common law torts. *Id.*

### 3. Statutory action for "wrongful entry", Indiana Code § 35–33–5–7(e).

Indiana Code § 35–33–5–7(e) provides a statutory cause of action for the defendants' mistaken entry:

A person or persons whose property is wrongfully damaged or whose person is wrongfully injured by any law enforcement officer or officers who wrongfully enter may recover such damage from the responsible authority and the law enforcement officer or officers as the court may determine.....

This section is thin on details and we have not found any Indiana decision that addresses it. This section was enacted in 1983, P.L.320–1983, § 7, nine years after the Tort Claims Act was enacted, Acts 1974, P.L. 142, § 1. Section 7(e) does not refer to the Tort Claims Act and it clearly conflicts with it in important respects by broadening the scope of recovery. Under the Tort Claims Act, only governmental entities are liable for the acts of their employees committed within the scope of their employment, I.C. § 34–13–3–5(a), but § 7(e) explicitly permits recoveries against law enforcement officers as well as the responsible authorities, although it is unclear whether § 7(e) contemplates vicarious as well as direct liability against responsible authorities. In addition, while the Tort Claims Act limits the damages recoverable *per* plaintiff and *per* occurrence and excludes punitive damages, § 7(e) allows recovery of "such damage[s] ... as the court may determine".

An Indiana court construing § 7(e) would presume that the General Assembly was aware of the provisions of the Tort Claims Act when enacting § 7(e), *White v. Indiana Parole Board,* 713 N.E.2d 327, 329 (Ind.Ct.App.1999), *trans. denied; WorldCom Network Services, Inc. v. Thompson,* 698 N.E.2d 1233, 1239 (Ind. Ct.App.1998), *trans. denied,* and that it did not intend to enact a useless provision, *White,* 713 N.E.2d at 329. Furthermore, when there is an irreconcilable conflict between two statutes on the same subject matter passed at different sessions of the legislature, the later-enacted statute will prevail over the earlier-enacted statute, *State ex rel. Indiana State Board of Finance v. Marion County Superior Court, Civil Division, Room 4,* 272 Ind. 47, 51, 396 N.E.2d 340, 344 (Ind.1979); *Waldridge v. Futurex Industries, Inc.,* 714 N.E.2d 783, 785 (Ind.Ct.App.1999); *Board of Trustees of Indiana Public Employees' Retirement Fund v. Grannan,* 578 N.E.2d 371, 375 (Ind.Ct.App.1991), *trans. denied,* and the more specific statute will control over the more general statute, *State v. Greenwood,* 665 N.E.2d 579, 583 (Ind. 1996); *Campbell v. State,* 714 N.E.2d 678, 683 (Ind.Ct.App.1999); *City Securities Corp. v. Department of State Revenue,* 704 N.E.2d 1122, 1128 (Ind. Tax Ct., 1998), to the extent of the conflict. *Horne v. State,* 572 N.E.2d 1333, 1334 (Ind.Ct.App.1991),

*trans. denied.* We assume, therefore, that the later-enacted § 7(e), which specifically addresses liability for wrongful entries, would supersede the earlier and more general Tort Claims Act to the extent it relates to wrongful entries and conflicts with § 7(e). By not including or referring to the Tort Claims Act's immunities or damages limits, we assume that the General Assembly intended that they not apply to § 7(e) and that a cause of action for "wrongful entry" would partake of all aspects of an ordinary tort action. We assume, therefore, that, just as with ordinary torts, governmental employers ("responsible authorities") can be vicariously, as well as directly, liable; that plaintiffs may recover for pain, suffering, and mental anguish regardless of physical injury; and that nominal and punitive damages are available.[28] We say we "assume" because the statute itself is silent on the relationship between the two statutes and we have no controlling decisions from Indiana courts. We have therefore determined to certify these questions of first impression and significant impact to the Indiana Supreme Court while indicating our initial impressions.

On its literal terms, I.C. § 35-33-5-7(e) applies only to wrongful entries, not wrongful failures to withdraw after a lawful or reasonably mistaken entry.

### 4. Article 1, Section 11 of the Indiana Constitution.

Article I, Section 11 of Indiana's Constitution virtually duplicates the language of the Fourth Amendment to the United States' Constitution, but Indiana courts have charted an independent jurisprudence for Section Eleven. *Baldwin v. Reagan,* 715 N.E.2d 332, 337 (Ind.1999); *Peterson v. State,* 674 N.E.2d 528, 533 (Ind.1996), *cert. denied,* 522 U.S. 1078, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998); *Brown v. State,* 653 N.E.2d 77, 79 (Ind.1995). While the requirement that searches and seizures be reasonable is the ultimate standard under both the Fourth Amendment, *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985); *Soldal v. Cook County, Illinois,* 506 U.S. 56, 71, 113 S.Ct. 538, 549, 121 L.Ed.2d 450 (1992); *S.L. v. Whitburn,* 67 F.3d 1299, 1307 (7th Cir.1995); *United States v. Gosha,* 78 F.Supp.2d 833, 838–39 (S.D.Ind. 1999), and Section Eleven, *Peterson,* 674 N.E.2d at 533; *Peete v. State,* 678 N.E.2d 415, 419 (Ind.Ct.App.1997), *trans. denied,* Indiana has rejected specific tests developed in federal law for applying this ultimate standard to particular scenarios, adhering only to the test of reasonableness for Section Eleven analysis, *see, e.g., Moran,* 644 N.E.2d at 540–41 (rejecting federal *Katz* two-prong test for expectation of privacy); *Brown,* 653 N.E.2d at 80 (rejecting federal warrant requirement); *Baldwin,* 715 N.E.2d at 337 (instead of federal concepts like a warrant requirement and probable cause, Indiana requires the state to bear the burden of showing that an intrusion was reasonable in the totality of the circumstances). *State v. Lamar,* 680 N.E.2d 540, 543 (Ind.Ct.App.1997).[29] In

**28.** See the discussions of common law actions above for authority for these elements. Punitive damages may be awarded for a trespass upon a showing of fraud, malice or oppressive conduct, *Sigsbee v. Swathwood,* 419 N.E.2d 789, 799 (Ind.Ct.App.1981); 28 I.L.E. "Trespass" § 14, p. 81, or if a trespasser is shown to be a "wilful trespasser", *American Sand and Gravel,* 55 Ind.App. at 527, 103 N.E. at 427. A wilful trespasser includes one who acts recklessly as well as intentionally or wilfully. *American Sand and Gravel,* 55 Ind.App. at 527, 103 N.E. at 427. Plaintiffs must establish their right to punitive damages by clear and convincing evidence. *Erie Insurance Co. v. Hickman,* 622 N.E.2d 515, 520

(Ind.1993); *Creative Demos, Inc. v. Wal–Mart Stores, Inc.,* 142 F.3d 367, 370 (7th Cir.1998).

**29.** Although some Indiana decisions hold that, under Section Eleven as under the Fourth Amendment, warrantless searches are *per se* unreasonable and place the burden on the state to show an exception, we have not found that the supporting authorities cited in those decisions are based on interpretations of Section Eleven. *See Lockett v. State,* 720 N.E.2d 762, 766 (Ind.Ct.App.1999); *Johnson v. State,* 710 N.E.2d 925, 927 (Ind.Ct.App. 1999); *DeLong v. State,* 670 N.E.2d 56, 57 (Ind.Ct.App.1996); *Zimmerman v. State,* 469 N.E.2d 11, 15 (Ind.Ct.App.1984).

some applications, Indiana's reasonableness analysis has produced virtually the same results as under Fourth Amendment law,[30] but it has also resulted in some significant differences.[31]

We have found no Indiana decisions applying Section Eleven's reasonableness analysis to the mistaken execution of a valid warrant on the wrong residence. However, because Indiana courts apparently have not defined any differences between Section Eleven and the Fourth Amendment that are relevant to this issue, and because federal courts have not defined a particular test for mistaken entries, we assume that analysis under Section Eleven would ask the same questions as under the Fourth Amendment, *viz.*, whether law enforcement officers took reasonable steps to accurately identify the warrant residence. We assume that Section Eleven's reasonableness standard would also govern the length of the defendant deputies' presence in the plaintiffs house, requiring them to withdraw when they realized or should have realized their mistake. *Cf. Coates v. State,* 534 N.E.2d 1087, 1092 (Ind.1989) (investigatory detentions

must last no longer than necessary to accomplish the purpose (but uncertain if based on state constitutional law)).

 Indiana courts have not recognized or rejected a private cause of action for damages to remedy deprivation of rights under Article I of its Constitution. Not surprisingly, decisions have also not addressed whether the procedures, immunities, and limitations of the Tort Claims Act would apply to such an action. One published federal district court decision in the Northern District of Indiana held that Indiana courts had recognized an action for damages under the Indiana Constitution. *Discovery House, Inc. v. Consolidated City of Indianapolis,* 43 F.Supp.2d 997, 1004 (N.D.Ind.1999). We do not agree that the cases cited in support of that proposition so hold. An unpublished decision from this Court declined to consider whether Indiana courts would recognize a private right of action for damages under the Indiana Constitution. *Craig v. Chief of Police Donald Christ,* Cause No. IP 96–1570–C–H/G, "Entry on Defendants' Motions for Summary Judgment and to Dismiss and City's Motion to Strike", p. 5 (S.D.Ind., December 15, 1998).[32] When a

**30.** Although, as noted, Indiana specifically rejects the federal rule requiring a warrant unless the government establishes one of a few limited exceptions, decisions applying Section Eleven's reasonableness analysis appear to establish a preference or presumption for warrants with exceptions that parallel those under federal law. *Brown,* 653 N.E.2d at 80 (while use of a warrant does not necessarily mean that a search was reasonable under Section Eleven, there is a "preference" for warrants and a warrant is "a preeminent form of support for a determination that the state standard of probable cause and reasonableness was met"); *Moran,* 644 N.E.2d at 539 ("The state standard of reasonableness frequently requires that police action occur only with a judicial sanction"; this "preference" for warrants "reflects a well-grounded belief that many searches require a warrant in order to be reasonable"). *See Pettit v. State,* 207 Ind. 478, 481, 188 N.E. 784, 785 (Ind.1934). In addition, although Indiana has rejected the federal *Katz* two-prong test for expectations of privacy (an actual subjective expectation of privacy that society recognizes as reasonable) in favor of its reasonableness test, it is difficult to discern how the test differs in application or result. *Moran,* 644

N.E.2d at 540–41 and n. 3 (Section Eleven protects areas that Hoosiers regard as "private, *i.e.,* concealed and hidden" which is a "precursor" to the *Katz* subjective-objective test).

**31.** *See, e.g., Peterson,* 674 N.E.2d at 534 (while the Fourth Amendment protects legitimate expectations of privacy only in premises searched, Section Eleven also protects expectations of privacy in property seized).

**32.** Judge Hamilton wrote in *Craig:* "[T]he Supreme Court of Indiana has never taken the step under the Indiana Constitution that the Supreme Court of the United States took under the federal Constitution in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). That decision recognized an implied right under the United States Constitution to sue individual federal agents for damages for violations of the federal constitutional rights. Perhaps the Indiana court will take such a step some day, but it has not yet given any hint that it is inclined to do so. Recognizing such an implied right to sue for damages under the Indiana Constitu-

federal district court sits in diversity, it should decide questions of state law as it believes the highest court of the forum state would decide them, even when those questions are difficult, uncertain, or of first impression.

But we are of the opinion that the difficulties of ascertaining what the state courts may hereafter determine the state law to be do not in themselves afford a sufficient ground for a federal court to decline to exercise its jurisdiction to decide a case which is properly brought to it for decision.

The diversity jurisdiction was not conferred for the benefit of the federal courts or to serve their convenience. Its purpose was generally to afford to suitors an opportunity in such cases, at their option, to assert their rights in the federal rather than in the state courts. In the absence of some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred, which would in exceptional cases warrant its non-exercise, it has from the first been deemed to be the duty of the federal courts, if their jurisdiction is properly invoked, to decide questions of state law whenever necessary to the rendition of a judgment. When such exceptional circumstances are not present, denial of that opportunity by the federal courts merely because the answers to the questions of state law are difficult or uncertain or have not yet been given by the highest court of the state, would thwart the purpose of the jurisdictional act.

*Meredith v. City of Winter Haven*, 320 U.S. 228, 234–35, 64 S.Ct. 7, 11, 88 L.Ed. 9 (1943). *Stephan v. Rocky Mountain Chocolate Factory, Inc.*, 129 F.3d 414, 416–17 (7th Cir.1997); *Giffin v. Summerlin*, 78 F.3d 1227, 1230 (7th Cir.1996); *Huff v. White Motor Corp.*, 565 F.2d 104, 105–06 (7th Cir.1977). Because the answer to the constitutional tort question might work a

dramatic change in the state's liability (at least in federal court), the issue is especially sensitive as Judge Hamilton recognized in *Craig*. However, we should not avoid answering the question for that reason. The opportunity the Indiana Supreme Court has afforded to certify such questions eliminates the inherent federalism tensions when a federal court ventures to decide such important issues of state law and assures that the answer will be authoritative. Therefore, rather than attempting to analyze relevant concepts in Indiana constitutional law or predict the Supreme Court's evaluation of the policy issues involved (which might or might not agree with the principles supporting the federal *Bivens* action), we have decided to certify this question to the Supreme Court of Indiana. We leave it to the parties to present to the Supreme Court of Indiana the arguments for and against the recognition of a private right of action for damages and the contours of such an action.

## 5. Conclusions.

We find no significant difference among the standards of the Fourth Amendment, Section Eleven, and common law trespass in determining liability for mistaken entries by law enforcement officers. The outcome of each depends on a showing of objective reasonableness. Whether the defendant deputies in this case took objectively reasonable steps to assure the correct identification of the warrant residence determines whether their entries into the plaintiffs' house was a reasonable mistake under the Fourth Amendment and Section Eleven and whether they had a reasonable belief that their entry was authorized under trespass law. All three provisions also appear to allow the plaintiffs to recover for their claims that the defendant deputies unreasonably failed to depart after they discovered or should have discovered that their entry was a mistake.

---

tion would work a dramatic change in Indiana law, in the relationships between citizens and their state and local governments, and between those governments and their em-

ployees. If such a step is to be taken, it will need to be taken by the Indiana courts, not by a federal court whose duty it is to apply existing Indiana law."

We assume that an objectively unreasonable entry in violation of Fourth Amendment, Section Eleven, or trespass protections would also constitute a "wrongful entry" under I.C. § 35–33–5–7(e). As noted above, I.C. § 35–33–5–7(e) literally would not apply to an unlawful failure to depart after a lawful, or reasonably mistaken, entry.

One significant difference among the provisions is that, even if the jury finds that the deputies' initial entry into the plaintiffs' house was reasonable under the Fourth Amendment and Section Eleven, and not "wrongful" under I.C. 35–33–5–7(e), the plaintiffs could still recover damages from the moment of the deputies' entry under the doctrine of trespass *ab initio* if the jury finds that the deputies exceeded their lawful authority at any time after their entry by, for example, using excessive force against the plaintiffs or failing to retreat when they should have.

Although the substantive standards are identical, there is a marked difference in the remedial scope of each provision. The plaintiffs may recover all of their compensatory and punitive damages (and attorney's fees) against the individual deputies under § 1983, but not the Sheriff. Under the Tort Claims Act, only the Sheriff may be sued for trespass, but he is not liable for punitive damages and compensatory damages are limited. It is unclear whether § 3(7) immunizes the Sheriff from trespass claims alleging that officers mistakenly entered property to execute a search warrant. Under I.C. § 35–33–5–7(e), the defendant deputies and the Sheriff would be liable for the wrongful entry, but it is unclear whether punitive damages are available and whether the Tort Claims Act's immunities and damages limitations are applicable. Therefore, the interpretation of I.C. §§ 35–33–5–7(e) and 34–13–3–3(7) and the determination of whether a private right of action exists to remedy

deprivations of Section Eleven, will determine whether the plaintiffs will be able to recover all of their damages against the Sheriff.

**B. Failure to knock and announce.**

The plaintiffs claim recovery for the defendants' failure to knock and announce under three theories.

**1. § 1983, Fourth and Fourteenth Amendments to the United States Constitution.**

 The requirement that officers knock and announce their authority and purpose before entering a dwelling is part of the Fourth Amendment which is applicable to the states through the Fourteenth Amendment. *Wilson v. Arkansas,* 514 U.S. 927, 934, 115 S.Ct. 1914, 1918, 131 L.Ed.2d 976 (1995); *United States v. Spry,* 190 F.3d 829, 833 (7th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 967, 145 L.Ed.2d 838 (2000).[33] A knock and announcement is required whenever officers make an uninvited intrusion into a dwelling, even if it is by simply opening a closed but unlocked door. *Sabbath v. United States,* 391 U.S. 585, 590, 88 S.Ct. 1755, 1758, 20 L.Ed.2d 828 (1968); *Bragg,* 138 F.3d at 1195. A knock and announcement is excused in the presence of certain exigent circumstances, including where police "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin,* 520 U.S. 385, 394, 117 S.Ct. 1416, 1421, 137 L.Ed.2d 615 (1997). *Wilson,* 514 U.S. at 936, 115 S.Ct. at 1918–19; *Spry,* 190 F.3d at 833. The burden is on law enforcement officers to establish the presence of exigent circumstances. A *per se* or blanket policy, practice, or custom excusing a knock and

---

**33.** The federal knock and announce statute, 18 U.S.C. § 3109, has no bearing in the analysis of the constitutional Fourth Amendment requirements applicable to Indiana. In fact, the Fourth Amendment, incorporating the common law of announcement, informs the meaning of § 3109. *United States v. Ramirez,* 523 U.S. 65, 72–73, 118 S.Ct. 992, 997, 140 L.Ed.2d 191 (1998).

announcement in felony drug cases on the grounds of safety for the officers or destruction of evidence is unreasonable under the Fourth Amendment. *Richards,* 520 U.S. at 389–90, 395, 117 S.Ct. at 1419, 1422; *United States v. Gambrell,* 178 F.3d 927, 929 (7th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 281, 145 L.Ed.2d 236 (1999). After giving a knock and announcement, officers may forcibly enter a dwelling only if they have been refused admittance, which requires that they wait long enough after the announcement for someone to respond and/or grant admittance. *Bragg,* 138 F.3d at 1195; *United States v. Markling,* 7 F.3d 1309, 1318 (7th Cir.1993). Purposes of the knock and announce rule include protecting the deeply rooted reverence for an individual's right of privacy in his home, safeguarding officers who might otherwise be mistaken for hostile intruders, preventing needless damage to occupants' property, *Sabbath,* 391 U.S. at 589, 88 S.Ct. at 1758; *Bragg,* 138 F.3d at 1195, and affording an opportunity for police to discover mistakes before violating innocent persons' rights, *State v. Prudhomme,* 287 N.W.2d 386, 389 (Minn.1979) (purposes served by the notice requirement include "protecting innocent people by minimizing the chances of entry of the wrong premises by mistake" and "protecting people against unnecessary shock or embarrassment connected with unannounced entries"); *People v. Casias,* 193 Colo. 66, 76 n. 12, 563 P.2d 926, 933 n. 12 (Colo.1977) ("notice also provides a point where any error in the address or other details of the warrant can be determined").

The previous discussion on the procedural and substantive limits of § 1983 actions applies to an action to remedy a deprivation of the knock and announcement guarantee.

### 2. Article I, Section 11 of the Indiana Constitution.

Section Eleven requires police officers to knock and announce their authority and purpose before conducting a search. *Moran,* 644 N.E.2d at 539; *Davenport v. State,* 464 N.E.2d 1302, 1305 (Ind.), *cert. denied,* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984); *State v. Dusch,* 259 Ind. 507, 512, 514, 289 N.E.2d 515, 517, 518 (Ind. 1972). After an announcement is made, occupants must have a reasonable opportunity to respond and allow peaceful entry before officers may forcibly enter. *Dusch,* 259 Ind. at 514, 289 N.E.2d at 518. "The mere fact that there are drugs involved in the search cannot be held to create a per se exception to the announcement requirement." *Dusch,* 259 Ind. at 513, 289 N.E.2d at 518.[34]

The previous discussion regarding a private right of action to remedy violations of Section Eleven applies here as well.

### 3. Statutory action for "wrongful entry", Indiana Code § 35–33–5–7(e).

The parties did not address I.C. § 35–33–5–7(e) as the basis of an action for violation of the knock and announce requirement, but we assume that violation of the Fourth Amendment's, Section Eleven's, and the common law's requirements of a knock and announcement would render an entry "wrongful" under this section. We also assume that an entry would be "wrongful" if it violated statutory provisions, such as the immediately previous section requiring an announcement before execution of a search warrant:

> A law enforcement officer may break open any outer or inner door or window in order to execute a search warrant, if he is not admitted following an announcement of his authority and purpose.

*Dusch,* 259 Ind. at 510, 289 N.E.2d at 516.

---

**34.** The knock and announce requirement also arises from the common law of Indiana.

I.C. § 35–33–5–7(d). This section explicitly requires a prior announcement of both authority and purpose and implicitly requires some period of delay following an announcement to determine whether nonadmittance permits a forced entry. More importantly, however, its text allows no exceptions for exigent circumstances. Statutes may, of course, provide greater protections than constitutional rights. Although we note that a few decisions have cited exigent circumstances when denying motions to suppress asserting violations of the identical section of the arrest warrant statute, I.C. § 35–33–2–3(b) (formerly § 35–1–19–6 (1971)), they do so on the basis of constitutional, not statutory, analysis. *See Cannon v. State,* 414 N.E.2d 578, 580 (Ind.Ct.App.1980); *Johnson v. State,* 157 Ind.App. 105, 111–12, 299 N.E.2d 194, 197–98 (Ind.Ct.App.1973).[35] Even if we read these decisions as statutory interpretations, however, they excuse only the statute's requirement that officers announce their purpose. *Id.* We have found no decision explicitly excusing the statutory announcement requirement altogether and, on the evidence submitted so far, a jury could reasonably find that no announcement of authority and no pause for response or denial of entry were made. To the extent that I.C. § 35–33–5–7(d) imposes a broader knock and announce protection than does the Fourth Amendment, Section Eleven, and the common law, the defendants might be subject to liability for

damages under I.C. § 35–33–5–7(e) even with no constitutional violation.

As discussed above, we certify to the Supreme Court several questions regarding the interpretation of the substantive and remedial aspects of this section.

### 4. Conclusions.

We find no significant differences in the knock and announce standards under the Fourth Amendment and Section Eleven.

The plaintiffs (two of whom were in the front room of the house) testified that there was no knock or announcement before the deputies entered. Of the three defendant deputies, all of whom were part of the "front door team" and entered at the same time, only Sergeant McAtee made any comment about a knock or announcement in her affidavit. She testified simply that "[t]he door was unlocked so we turned the knob and went in, after announcing that we were the Marion County Sheriff's Department." McAtee Affidavit, ¶ 14. Buckner Affidavit, ¶ 14; Tomey Affidavit, ¶ 11. The defendants also presented the deposition of a civilian who was sitting in Captain Tomey's car across the street from the plaintiffs' house. She testified that "[t]he officers announced themselves" prior to entering the house. Gibbs Deposition, pp. 15–17. She did not recall if anyone knocked on the door and she did not mention an interval of time between the announcement she heard and the deputies' entrance. The defendants presented no evidence of a knock or of the length of

**35.** Judicial exclusionary rules are generally applied to vindicate constitutional, not statutory, rights, *United States v. Ramsey,* 165 F.3d 980, 991 (D.C.Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 223, 145 L.Ed.2d 187 (1999), so it would not be unexpected for these decision to rely on constitutional principles when denying suppression motions which mention statutory violations. However, the exclusionary sanction is occasionally applied to vindicate statutory entitlements that are designed to give added protection to constitutional rights. *See United States v. Ware,* 161 F.3d 414, 424 (6th Cir.1998), *cert. denied,* 526 U.S. 1045, 119 S.Ct. 1348, 143 L.Ed.2d 511 (1999) ("While the exclusionary rule has been applied to remedy statutory violations, these

cases typically implicate underlying constitutional rights such as the right to be free from unreasonable searches and seizures"). On its face, I.C. § 35–33–5–7(d) appears to afford more protection than Section Eleven by not providing for exigent circumstance exceptions. However, if *Cannon* and *Johnson* are to be understood as enforcing § 7(d)'s announcement requirements, then their reliance solely on constitutional precedents to recognize exigent circumstance exceptions under § 7(d) would appear to mean that the statutory and constitutional knock and announce requirements should be interpreted identically. That would appear to render § 7(d) virtually superfluous.

any pause between an announcement and the deputies entering. In our summary judgment ruling, we found that these facts presented a genuine issue about the existence of a proper knock and announcement.

The defendants did not argue that exigent circumstances excused a knock, announcement, or pause, but the deputies' affidavits express a concern for their safety because they believed that they were in an exposed position outside the house and that the occupants of a residence suspected of housing narcotics dealing are likely to be armed and dangerous.[36] They did not articulate any facts specific to the occupants of the house or the events at the scene (except for the observation of two males in the front room of the house) to support their fear. The deputies did not state that they feared destruction of evidence, saw evidence that the occupants had discovered the officers, witnessed any furtive movement of the occupants, had any evidence that there were weapons at the scene, or any specific information about the occupants. Further, they testified that they had a clear view of the front room of the house and had the two male subjects in view and could monitor their movements. On these facts, there is a genuine issue whether exigent circumstances existed to excuse a knock, announce, and pause.

Detective Buckner stated that he realized the possibility of a mistake when he noticed that the ages and names of the plaintiffs did not match those he expected at the warrant residence. When he then confirmed his mistake by checking the address numbers on the front porch pillars, he informed the other deputies that a mistake had been made.[37] Because it was the names and ages of the plaintiffs that indicated that the deputies were mistaken, there is a genuine issue whether a proper knock, announcement, pause, and resulting dialogue with the plaintiffs might have avoided the mistaken entrance into the plaintiffs' house, one of the objectives of the knock and announce protection.

**36.** The warrant was executed after nightfall. The deputies stated that the plaintiffs' porch light was not on. In their affidavits, the deputies stated that, because the warrant involved drug-related felonies, they considered and treated the occupants as armed and dangerous. Upon their approach, the deputies saw two male subjects in the well-lit front room of the house, through the glass front door and large windows across the front of the house. The deputies said that they were fully exposed on their arrival and they knew that the male subjects in the front room could see the deputies "if we did not enter immediately." They "had to enter dark and quick." The deputies said that they believed that it would have jeopardized officer safety to illuminate the front porch pillars to check the address of the house. Buckner Affidavit, ¶¶ 12, 13, 15; McAtee Affidavit, ¶¶ 11–13. It is an interesting question whether the information related in Detective Buckner's probable cause affidavit was fresh enough to support a reasonable belief that narcotics manufacturing or dealing, or that the dealers themselves, would still be at the residence nine days later, especially after the occupants must have learned that their equipment and other evidence had been seen and seized by a deputy sheriff. Detective Buckner's return of the warrant records that only 2.77 grams of marijuana were seized from the warrant residence after they left the plaintiffs' house.

**37.** Detective Buckner averred:

16. As we began to secure the premises, I realized that the people in the home did not appear to be the right age as the people at 5201 West Chelsea. I asked Odealia Turner her name, and when she told me, I checked the paperwork and realized the names did not match.

17. I immediately went outside with a flashlight to try to locate the numbers on the house. I originally had trouble finding them, due to their location way above the porch, and their small size.

Buckner Affidavit, ¶¶ 16, 17. McAtee Affidavit, ¶ 15 ("As we were securing the residence room-by-room, Detective Buckner realized that the names of the people in the home were not the same as those on the warrant, and he determined that we were at the wrong address"). Although Captain Tomey stated that he did not see the expected door with padlocks on it in the basement as described in the probable cause affidavit, it was not that fact that signaled to the deputies that they had made a mistake. Tomey Affidavit, ¶¶ 13–15.

Section 1983 allows the plaintiffs to recover compensatory and punitive damages without statutory limit against the defendant deputies for deprivation of their knock and announce rights. According to our summary judgment ruling, they may not recover § 1983 damages against the Sheriff. Whether the Sheriff can be held vicariously liable under I.C. § 35–33–5–7(e) and whether he may assert the immunities, damages limits, and punitive damages ban of the Tort Claims Act thereunder will depend on the Supreme Court's interpretation of this statute. To the extent that the Supreme Court's interpretation does not allow the plaintiffs to recover punitive damages or uncapped compensatory damages against the Sheriff, regardless of Tort Claims Act immunities, and a private right of action under Section Eleven would allow such recoveries, an answer to our certified question about the existence of such an action will become relevant.

To the extent that I.C. § 35–33–5–7(d) provides greater knock and announce protection than the Fourth Amendment and Section Eleven, the plaintiffs may be able to recover damages under I.C. § 35–33–5–7(e) even if they were not deprived of their federal or state constitutional rights.

### C. Excessive seizures and uses of force against the plaintiffs.

#### 1. § 1983, Fourth and Fourteenth Amendments to the United States Constitution.

The Fourth Amendment governs claims that law enforcement officers used excessive force during a search or seizure. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) ("*all* claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard ...."). The Fourth Amendment requires that officers act reasonably when securing occupants during a search. *See Ramirez*, 523 U.S. at 71, 118

S.Ct. at 996; *United States v. Singer*, 943 F.2d 758, 761 (7th Cir.1991).

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 397, 109 S.Ct. at 1872 (citations omitted). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* (citations omitted). *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir.1997), *cert. denied*, 522 U.S. 1116, 118 S.Ct. 1052, 140 L.Ed.2d 115 (1998); *Mason v. Hamilton County*, 13 F.Supp.2d 829 (S.D.Ind.1998). To show that excessive force has been used, there must be "(1) a 'seizure' as the Fourth Amendment defines that term; and (2) the seizure, if one occurred, must have been unreasonable under the circumstances." *United States v. Bradley*, 196 F.3d 762, 767 (7th Cir.1999). A seizure occurs when officers in some way restrain the liberty of a citizen by means of physical force or a show of authority. *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10; *Bradley*, 196 F.3d at 767.

The Fourth Amendment governs each component of the plaintiffs' excessive force or excessive seizure claims. First, the plaintiffs claim that they were unreasonably seized *in toto* because the defendant deputies unlawfully entered their house. Second, if their initial entry was reasonable, then the deputies used unreasonable force when seizing and exerting control over them during the search. *See Summers,* 452 U.S. at 701–05, 101 S.Ct. at 2593–95 (detaining occupants during the execution of a search warrant is constitutionally reasonable); *Liston,* 120 F.3d at 975–76. Finally, the plaintiffs claim that the defendant deputies' seizure of them was unreasonable when they failed to immediately depart after they realized or should have realized that they entered the wrong house. *Pierce v. Multnomah County, Oregon,* 76 F.3d 1032, 1040 (9th Cir.), *cert. denied,* 519 U.S. 1006, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996) ("[T]he Fourth Amendment requires that the length and scope of a detention be 'strictly tied to and justified by the circumstances which rendered its initiation permissible.' "); *Pray,* 49 F.3d at 1160–61 ("once the officers realized they were in the wrong residence, they had a duty to retreat and the need for application of force, absent other factors, would be non-existent. Thus, the use of force after that point would be excessive and no longer cloaked with qualified immunity"); *United States v. Blanco,* 844 F.2d 344, 351 (6th Cir.), *cert. denied,* 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988) (officers may detain occupants of a searched dwelling for a reasonable period of time); *Reed v. Marker,* 762 F.Supp. 652, 656 (W.D.Pa.1991). Therefore, the Fourth Amendment applies to the plaintiffs' complaints about the harshness and duration of their detentions.[38]

The procedural aspects and remedial limitations of a § 1983 action to remedy Fourth Amendment deprivations were discussed above. Only the individual deputy sheriffs are liable for compensatory and punitive damages without statutory limit.

## 2. Common law battery.

In Indiana, battery is "the touching of a person in a rude and insolent manner against the will of the person touched .... The least touching of another in a rude and insolent manner is a battery ...." *McGlone v. Hauger,* 56 Ind.App. 243, 257–58, 104 N.E. 116, 121–22 (Ind.Ct. App.1914). *Fields v. Cummins Employees Federal Credit Union,* 540 N.E.2d 631, 640 (Ind.Ct.App.1989) (battery is " '[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent ....' "); *Cohen v. Peoples,* 140 Ind.App. 353, 355, 220 N.E.2d 665, 667 (Ind.App.1966) ("Any touching, however slight, may constitute assault and battery"). Battery is an intentional, not a negligent, tort, *Boruff v. Jesseph,* 576 N.E.2d 1297, 1298–99 n. 3 (Ind.Ct.App. 1991), and defendants will be liable if they act recklessly or with reckless disregard of the consequences, *Reynolds v. Pierson,* 29 Ind.App. 273, 275, 64 N.E. 484, 485 (Ind. App.1902). Law enforcement officers are privileged to use force against another person in the performance of their duties under a standard of objective reasonableness. *See City of South Bend v. Fleming,* 397 N.E.2d 1075, 1077 (Ind.Ct.App.1979);[39] I.C. § 35–41–3–3.

---

**38.** *Cf. Whitlock v. Jackson,* 754 F.Supp. 1394, 1399 (S.D.Ind.1991) (noting possible applicability of Fourth Amendment reasonableness standard to excessive uses of force to seize a person but substantive due process standard to excessive uses of force after a person has been seized).

**39.** "A police officer in the lawful discharge of his duties is privileged to use only that force which is reasonable and necessary to effect an arrest. If he uses unnecessary force his conduct is no longer privileged and he is answerable for an assault and battery. In this context, any reference to the doctrine of negligence is superfluous, for the use of the term 'negligence' tends to characterize the state of mind of the actor. The issue is whether under the circumstances the force used was excessive. If it was, the assault and battery was not privileged. On the other hand, if the force used was reasonable and was incident

Officers who use excessive force are subject to common law suits for assault and battery. *Crawford v. City of Muncie,* 655 N.E.2d 614, 622 (Ind.Ct.App.1995), *trans. denied; Fleming,* 397 N.E.2d at 1077; *City of Gary v. Archer,* 157 Ind.App. 477, 300 N.E.2d 687 (Ind.Ct.App.1973), *trans. denied.* Under the Tort Claims Act, only the Sheriff may be sued for the deputies' batteries. I.C. § 34–13–3–5(a). Under the public-private duty test before *Benton,* officers did not enjoy immunity from battery claims under § 34–13–3–3(7) of the Tort Claims Act, *Kemezy,* 622 N.E.2d at 1297, but whether this remains a proper interpretation of § 3(7) after *Benton* is one of our certified questions.

 Plaintiffs may recover damages for mental pain and anguish, shame, and humiliation that are caused by a battery. *McGlone,* 56 Ind.App. at 259–60, 104 N.E. at 122; *Singer Sewing Machine Co. v. Phipps,* 49 Ind.App. 116, 125, 94 N.E. 793, 796–97 (Ind.App.1911). A jury may award nominal damages. *McGlone,* 56 Ind.App. at 259, 104 N.E. at 122. As discussed above, under the Tort Claims Act, damage limits apply and punitive damages may not be awarded against the Sheriff.

**3. Common law torts of false arrest and false imprisonment.**

 "False imprisonment consists of an unlawful restraint on one's freedom of movement against his will. In proving restraint on freedom of movement, incarceration need not be shown. Rather, it is sufficient to show a person's freedom of movement was in some manner restricted against his will." *Delk v. Board of Com-*

*missioners of Delaware County,* 503 N.E.2d 436, 439 (Ind.Ct.App.1987). *Roddel v. Town of Flora,* 580 N.E.2d 255, 259 (Ind.Ct.App.1991), *trans. denied* (same standard described for false arrest and false imprisonment). To make out a case of false arrest or false imprisonment, a plaintiff has the burden of showing that his arrest [40] was "false" and that the arresting officers did not act in good faith. *Roddel,* 580 N.E.2d at 259; *Garrett v. City of Bloomington,* 478 N.E.2d 89, 93–95 (Ind. Ct.App.1985), *trans. denied.* An arrest is false if it is accomplished without the required legal basis, *e.g.,* probable cause for a custodial arrest and reasonable suspicion for a *Terry* stop. A defendant officer will not be liable for false arrest simply because he unlawfully arrested the plaintiff, but only if he also failed to act in good faith. Good faith has a subjective and an objective component: a defendant officer must actually have had a good faith belief that he had lawful authority to arrest the plaintiff and his belief (not the arrest) must have been objectively reasonable.[41] *Trobaugh v. Hellman,* 564 N.E.2d 285 (Ind.Ct.App.1990); *Garrett,* 478 N.E.2d at 94. Actions done recklessly are not done in good faith. *See Bradley v. State,* 609 N.E.2d 420, 423 (Ind.1993) (good faith exception to the exclusionary rule); *Newby v. State,* 701 N.E.2d 593, 602 (Ind.Ct.App. 1998) (same); *Cochran v. Indianapolis Newspapers, Inc.,* 175 Ind.App. 548, 559, 372 N.E.2d 1211, 1220 (Ind.Ct.App.1978) (good faith defense to defamation); *Weenig v. Wood,* 169 Ind.App. 413, 439, 349 N.E.2d 235, 250–51 (Ind.Ct.App.1976). The burden of proof is on the plaintiff to

---

to a lawful arrest, it was privileged." *Fleming,* 397 N.E.2d at 1077.

**40.** We use "arrest" to denote all seizures of a person, *i.e.,* all forms of restriction of a person's freedom of movement by a law enforcement officer, from a full custodial arrest to a *Terry* stop to a detention of occupants during the execution of a warrant. *See Graham,* 490 U.S. at 395, 109 S.Ct. at 1871; *Roberts v. State,* 599 N.E.2d 595, 598 (Ind.1992); *Bryant v. State,* 157 Ind.App. 198, 206, 299 N.E.2d 200, 204 (Ind.Ct.App.1973).

**41.** This defense would not allow the Sheriff an opportunity to avoid liability for false arrest if he is liable under the Fourth Amendment or Section Eleven. If, under the constitutional standard, an officer failed to make an objectively reasonable effort to assure a lawful arrest, then, under the standard for false arrest, the officer could not have had an objectively reasonable belief that the arrest was lawful.

prove the absence of lawful authority for his arrest and the absence of good faith. A law enforcement officer who detains a person for a longer period of time than necessary may be liable in an action for false imprisonment. *Harness v. Steele*, 159 Ind. 286,,64 N.E. 875, 878–79 (Ind. 1902).

Under the Tort Claims Act, only the Sheriff is liable on the plaintiffs' false arrest and false imprisonment claims. Actions for false arrest and false imprisonment are specifically excluded from the Tort Claims Act's "enforcement of a law" immunity, I.C. § 34–13–3–3(7), and we found in our summary judgment ruling that no other immunities apply.

■■■■ Ordinary tort damages for mental anguish and nominal damages are available. As discussed above, under the Tort Claims Act, damage limits apply and punitive damages are not available against the Sheriff.

#### 4. Indiana Code § 35–33–5–7(e).

We presume that a plaintiff may recover damages for all injuries that were caused by a wrongful entry under I.C. § 35–33–5–

7(e), including injuries caused by officers' use of excessive force (battery) or excessive detention (false arrest) after they have wrongfully entered. Therefore, if, because of the restrictions of the Tort Claims Act, the plaintiffs are unable to recover all of their damages in battery or false arrest against the individual deputies and/or the Sheriff, then they might be able to recover these damages under § 7(e), depending on the answers to our certified questions about whether the Tort Claims Act applies to actions under § 7(e) and whether § 7(e) permits vicarious as well as direct liability.

#### 5. Article I, Section 11 of the Indiana Constitution.

We have found no Indiana decisions addressing excessive force claims under the rubric of Section Eleven of the Indiana Constitution.[42] Because Section Eleven parallels the Fourth Amendment and "protects Hoosiers against unreasonable police activity", *Lloyd v. State*, 677 N.E.2d 71, 76 (Ind.Ct.App.1997), *trans. denied*, we assume that Section Eleven prohibits excessive uses of force by officers to secure occupants during the execution of a search warrant under the same reasonableness standard as the Fourth Amendment.[43]

---

**42.** The only Indiana decisions we found that addressed constitutional excessive force claims under an "unreasonable seizure" standard did.so on the basis of federal law. *See, Conwell v. State*, 714 N.E.2d 764, 768–69 (Ind.Ct.App.1999); *Foxall v. State*, 157 Ind. App. 19, 27–32, 298 N.E.2d 470, 474–77 (Ind. Ct.App.1973).

**43.** The plaintiffs did not assert Article I, Section 15 of the Indiana Constitution as a basis for their excessive force claims ("No person arrested, or confined in jail, shall be treated with unnecessary rigor"). Although Section Fifteen is specifically targeted at officers' uses of force during arrests and would therefore ordinarily govern over the more general Section Eleven, *see Richardson v. State*, 717 N.E.2d 32, 71 (Ind.1999) (Boehm, J., concurring); *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994); *Tesch v. County of Green Lake*, 157 F.3d 465, 471 (7th Cir.1998); *Patton v. Przybylski*, 822 F.2d 697, 699 (7th Cir.1987), it is unclear whether the arrests encompassed by Section Fifteen include non-custodial arrests such as the detention of occupants during the execu-

tion of a search warrant, *cf. Schaefer v. Goch*, 153 F.3d 793, 796 (7th Cir.1998) (more specific Fourth Amendment standard will apply over the general substantive due process standard of the Fourteenth Amendment only if a Fourth Amendment "seizure" has occurred). Section Fifteen offers less protection than Section Eleven. *McQueen v. State*, 711 N.E.2d 503, 505.(Ind.1999) (not every excessive or unlawful use of force amounts to "unnecessary rigor"; Section Fifteen prohibits only "extreme instances of mistreatment and abuse"). The instances of excessive force that the plaintiffs have alleged that remain viable (*e.g.*, wrenching of Jason Turner's arm, abuse or embarrassment of Kathleen Turner) do not appear to meet *McQueen's* higher "unnecessary rigor" threshold. However, because the plaintiffs did not assert Section Fifteen, we consider any claim thereunder forfeited. If the Supreme Court concludes that Section Fifteen exclusively governs allegations of constitutional excessive force against non-custodial detainees, it may so instruct us; otherwise we will assume that Section Eleven applies to such allegations.

### 6. Conclusions.

We assume that there are no differences between the unreasonable seizure standards of the Fourth Amendment and Section Eleven: the defendants violated the plaintiffs' Fourth Amendment and Section Eleven rights if their uses of physical force against or detentions of the plaintiffs were objectively unreasonable. Because the Sheriff may defend against the plaintiffs' battery claims (if he is not immune under § 3(7)) by showing that his deputies' uses of force were objectively reasonable, the same standard should apply. Similarly, if the deputies' arrests of the plaintiffs are found to have been objectively unreasonable constitutionally, then any good faith belief they had that the arrests were lawful could not consistently be found to have been objectively reasonable.

Section 1983 allows the plaintiffs to recover all of their compensatory and punitive damages for both aspects of their "unlawful seizure" claims — excessive use of physical force and unlawful detention — against the individual deputies; our summary judgment ruling precludes recovery of § 1983 damages against the Sheriff. If § 3(7) immunity does not apply, the plaintiffs may impose liability on the Sheriff for their excessive force claims through the battery actions, but they cannot recover punitive damages and their compensatory damages are capped. If the Sheriff cannot show that his deputies reasonably believed in good faith that their detentions were lawful, the plaintiffs may impose liability on the Sheriff for their unlawful detention claims through their false arrest and false imprisonment actions, but they cannot recover punitive damages and their compensatory damages are capped. If the plaintiffs are able to recover for their excessive force and excessive detention claims under I.C. § 35–33–5–7(e), then, depending on the Supreme Court's interpretation of that section's relationship to the Tort Claims Act, they might be able to obtain all their compensatory and punitive damages against the deputies and against the Sheriff by *respondeat superior*. If a § 7(e) action would not afford such a broad recovery, but a private right of action under Section Eleven would allow the plaintiffs to recover punitive and compensatory damages against the Sheriff regardless of the Tort Claims Act, then an answer to the certified question of whether such an action exists will be relevant.

### IV. Certified questions.

The questions are progressive, as best we could arrange them, so earlier answers might moot later questions.

**1. Indiana Code § 34–13–3–3(7).** Does Indiana Code § 34–13–3–3(7) immunize a Sheriff or his deputies acting within the scope of their employment from:

**a.** common law trespass claims that deputy sheriffs executed a search warrant on the wrong residence?

**b.** common law battery claims that the deputy sheriffs used excessive force during the execution of a search warrant on the wrong residence?

**2. Sovereign Immunity.** Is the execution of a search warrant on the wrong residence so closely akin to one of the limited exceptions in *Campbell* and *Benton* (prevent crime, appoint competent officials, or make correct judicial decisions) that it should be treated as one as well?

**3. Indiana Code § 35–33–5–7(e).**

**a.** Is an entry wrongful and actionable under I.C. § 35–33–5–7(e) if the entry violates (1) the Fourth Amendment to the United States Constitution, (2) Article I, Section 11 of the Indiana Constitution, (3) common law trespass duties, or (4) I.C. § 35–33–5–7(d)?

**b.** Does I.C. § 35–33–5–7(e) establish an independent standard for determining when an entry is wrongful or does it incorporate existing constitutional, common law, and statutory standards?

**c.** Do the damages limits of I.C. § 34–13–3–4 apply to an action under I.C. § 35–33–5–7(e)?

**d.** If the damages limits of I.C. § 34–13–3–4 do not apply to an action

under I.C. § 35–33–5–7(e), are punitive damages otherwise available against a Sheriff or his deputies under I.C. § 35–33–5–7(e)?

**e.** May a Sheriff be held vicariously liable for the actions of his deputies under § 35–33–5–7(e) or may he be held only directly liable?

**f.** May plaintiffs recover damages for mental and emotional pain, suffering, anguish, and humiliation under I.C. § 35–33–5–7(e)?

**g.** May plaintiffs recover under I.C. § 35–33–5–7(e) for batteries and false arrests committed by officers after they wrongfully enter?

**4. Indiana Code § 35–33–5–7(d).**

**a.** Is the announcement requirement of I.C. § 35–33–5–7(d) subject to exigent circumstance exceptions? If so, are they the same exceptions that are recognized under Article I, Section 11 of the Indiana Constitution and the common law?

**b.** If I.C. § 35–33–5–7(d)'s announcement requirement is subject to exigent circumstances exceptions, may those circumstances excuse an announcement of authority and a pause for non-admittance?

**c.** May I.C. § 35–33–5–7(d)'s announcement requirement be excused on the *per se* or blanket ground that law enforcement officers are serving a search warrant for illegal controlled substances on a residence suspected of housing a narcotics distribution or sales operation because of a non-particularized fear that evidence will be destroyed or that the occupants are armed and dangerous?

**5. Trespass *ab initio.*** Is the doctrine of trespass *ab initio* still valid in Indiana?

**6. Article I, Section 11 of the Indiana Constitution.** Does a private right of action for damages exist to remedy deprivations of rights guaranteed by Article I, Section 11 of the Indiana Constitution? If such an action exists, then:

**a.** Does I.C. § 34–13–3–4 apply to such an action?

**b.** Does I.C. § 34–13–3–3(7) apply to such an action?

**c.** Does I.C. § 34–13–3–5(a) apply to such an action?

**d.** May such an action be asserted against individual governmental actors and their employing governmental entities?

**e.** May a Sheriff be held vicariously liable for the conduct of his deputies acting within the scope of their employment?

**f.** Are punitive damages available against a Sheriff or his deputies?

**g.** Does any non-Tort Claim Act immunity — such as the federal qualified immunity applicable to § 1983 actions — apply to such an action and, if so, what are its elements?

The Clerk of Court is directed to transmit six copies of this entry to the Clerk of the Supreme Court of Indiana and to promptly supply copies of any filings in this Cause which the Supreme Court or its Clerk requests.